[Crim. No. 14009.   Second Dist., Div. One.   July 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT OATIS, JR., Defendant and Appellant.

Earl R. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Larry Ball, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of selling marijuana.

In an information filed in Los Angeles on November 29, 1966, defendant was charged in count I with a violation of section 11531, Health and Safety Code, in that he did on

August 19, 1966, furnish marijuana; in count II he was charged with a similar violation on August 25, 1966. It was further alleged that defendant previously (September 1, 1966) had been convicted of a violation of section 11530, Health and Safety Code. On December 5, 1966, defendant pleaded not guilty and denied the charged prior conviction. On February 9, 1967, after a continuance granted at the request of defendant on January 9, 1967, a jury trial was legally waived and it was stipulated that the cause be submitted on the testimony contained in the transcript of the proceedings had at the preliminary hearing, each side reserving the right to offer additional evidence. It was further stipulated that all exhibits received at the preliminary hearing were deemed received into evidence, subject to the court's rulings. Additional testimony was taken and defendant was found guilty as charged in counts I and II. There was no finding as to the charged prior conviction as it developed with reference to that matter that on August 8, 1966, defendant was arrested and charged with the possession of marijuana and a violation of the deadly weapons control law. He appeared in court on September 22, 1966, and pleaded guilty to the possession of narcotics charge and the other count was dismissed. Proceedings were suspended and defendant was placed on probation for 5 years. While he was out on bail for that offense, he was arrested on the two charges with which we are now concerned. Clearly at the time of the commission of the present offenses defendant had not been convicted of the charged prior although at the time of sentence defendant had been so convicted. Probation was denied. A motion for a new trial was made and denied on May 18, 1967.

The clerk's transcript recites that on May 18th the judge referred the matter to the Department of Corrections for ''review regarding placement of the above named defendant for diagnosis and treatment, pursuant to the provisions of Section 1203.03 Penal Code.'' The reporter's transcript recites that after the order of referral under 1203.03 counsel for defendant advised the court that defendant ''wishes to file Notice of Appeal at this time, and he asks the Court to set bail.'' The judge called attention to the fact that any such notice was premature and counsel indicated that he understood that defendant could not ''do that until he comes back'' from the Chino diagnostic facility. The court then said, ''I don't think a Notice of Appeal prior to the time of sentence is imposed is of any force and effect whatsoever.''

On May 23, 1967, defendant filed his notice of appeal from the order denying his motion for a new trial. On June 1, 1967, when the cause came on for further proceedings the court, after being advised by defendant's counsel in defendant's presence that defendant "has been accepted under 1203.03" referred the defendant to the Department of Corrections for 90 days for diagnosis and report. The proceedings were adjourned until August 31, 1967. Defendant was taken to Chino; there a diagnosis and an unfavorable report was made and he was returned from Chino on August 4, 1967. On August 10, 1967, the matter came on for hearing, probation was denied and defendant was sentenced to the state prison on each count.

This court has given permission to file a late notice of appeal.

A résumé of some of the facts is as follows: Officer Fred Nixon of the Los Angeles Police Department was in a hotel on South Avalon Boulevard on August 19, 1966, with a person known to him as Pete Hardy. They were approached by James Alexander, and Hardy said to Nixon: "Let's go, Fred. James is going to get us a half a pound of weed." Nixon understood "weed" to mean marijuana. The three men then drove to a place on 55th Street where Alexander got out of the officer's car and left. Alexander returned with Wallace Stewart who got into the car and directed Nixon to an address on West 81st. There Stewart got out of the car; he returned shortly and asked who was to make the purchase. Nixon said he would; he then left the car and entered the house at 537 West 81st Street at about 12:30 p.m. Inside the house defendant was standing in the kitchen near a counter upon which was a bulk amount of marijuana. Nixon inquired of defendant whether he had any scales with which to weigh the amount he was to purchase. Defendant replied: "No, the scales aren't here. But it's guaranteed. If the amount is less than half a pound you can bring it back." Defendant then cut a portion from the block of marijuana, wrapped it in foil and handed it to Nixon. Nixon handed to defendant $50 in bills and left the premises.

On August 25, 1966, Nixon again saw defendant at the same last-named address at about 3:45 p.m. and after talking with Ronald Lewis, who was with defendant in the house, made a purchase of $125 worth of marijuana. The money was paid to defendant and the delivery was made by Lewis.

Appellant now asserts that he was entrapped by Nixon, that the classification and prohibition of possession of marijuana

as a crime is unconstitutional, being unreasonable and arbitrary, and that the evidence is insufficient to support the judgment.

The defense of entrapment was not made in the trial court. It cannot be made for the first time on the appeal. (See *People* v. *Tostado,* 217 Cal.App.2d 713, 719 [32 Cal.Rptr. 178] ; *People* v. *Cline,* 205 Cal.App.2d 309, 312 [22 Cal.Rptr. 916] ; *People* v. *Perez,* 62 Cal.2d 769, 775 [44 Cal.Rptr. 326, 401 P.2d 934] ; *People* v. *Braddock,* 41 Cal.2d 794, 803 [264 P.2d 521].) There can be no question that the record does not establish that there was entrapment as a matter of law. Appellant's standing near his kitchen sink cutting off a half pound of marijuana, taking $50 and guaranteeing its weight hardly has the ring of entrapment.

Appellant seemingly also complains about the officer's coming back and making the second buy of $125 worth of marijuana, saying in effect that it was unfair of the officer thereby to participate in doubling-up on appellant's troubles. Appellant might have thought of that when he was released on bail in the early part of August for possessing narcotics and might then have given serious thought to discontinuing his illicit course of conduct; rather he chose to sell marijuana as heretofore mentioned, and we are persuaded that he should now suffer the consequences.

With reference to the claimed unconstitutionality of classifying the sale or possession of marijuana as a crime much has been written.[1] There are many different and divergent viewpoints as to whether marijuana is a social detriment or otherwise.[2]

Some courts have made determinations on the subject matter, none of which, so far as our research extends, holds as appellant suggests that this court should hold. See *Spence* v. *Sacks,* 173 Ohio St. 419 [183 N.E.2d 363] ; *Gonzalez* v. *State of Texas,* 168 Tex.Crim. 49 [323 S.W.2d 55] ; *People* v. *Stark* (1965) 157 Colo. 59 [400 P.2d 923] ; *United States* v. *Eram-*

---

[1]*Constitutional Objections to California's Marijuana Possession Statutes* (1967).

56 Cal. L.Rev. 1.

*Marijuana and the Law* (1968) 1 San Fernando Valley L.Rev. 139.

[2]Edward R. Bloomquist, Associate Professor, U.S.C. School of Medicine.

Marijuana: Social Benefit or Social Detriment?

Facts About Marijuana.

Los Angeles Police Department (which contains an extensive bibliography).

*djian,* 155 F.Supp. 914, where it is held that marijuana is definitely related to the drug problem and the evils that flow from the use of drugs and where it is stated at 919, under footnote 3: " 'The great danger of this drug (marihuana) is the release of inhibitions accompanied by a definite loss of moral sense. The subject is dangerous to handle, has no fear, and can be placed under restraint only with great difficulty. Crimes committed while under the influence of this drug are apt to be of a particularly offensive type, characterized by a complete lack of moral restraint.

" 'While under the influence of marihuana, juveniles may be more easily introduced to the use of heroin. *The typical juvenile addict that comes to the attention of the police in this area has followed a familiar pattern—alcohol, marihuana or barbiturates (sometimes both), then heroin.* [Italics added.]

" 'Marihuana is known to be psychologically addicting, but some success is found in effecting a cure if treatment precedes definite mental deterioration.' A Study of Juvenile Drug Addiction in Los Angeles, Los Angeles Police Department, 1952, pp. 15-16.

" 'Marihuana strikes the central nervous system, greatly affects the mentality and the five physical senses . . . Inhibitions are lost to a greater extent than under the influence of alcohol. A person under the influence of marihuana may believe himself so small that he is afraid to step off the curbstone into the street, or he may feel of enormous size and of superhuman strength. While so intoxicated, because of his high susceptibility to suggestion, he may commit criminal acts and have exaggerated feelings of persecution, unfriendliness and animosity.' 'Effects of Marihuana,' State of California, Department of Justice, Bureau of Narcotic Enforcement, 1953-54, p.1.' '

It is appropriately stated by the Chief Counsel of the Bureau of Narcotics, United States Treasury Department, Donald E. Miller, in Vol. 4, No. 1, Journal of the National District Attorneys Association, in part, as follows:

". . . Some talented, even brilliant persons have taken marihuana and other hallucinogens and are adding an aura of intellectualism to such abuse.

". . . The permissivists have attempted to associate all manner of virtues with the use of marihuana, and to picture the substance as a 'benevolent herb' free of any danger to the user. As a result, many people are confused, and infractions of the laws have become more prevalent. One fact seems certain—unless the dangerous aspects of marihuana are treat-

ed accurately and sensibly, even more damage will be done.

". . . Many areas which were formerly free of drug abuse, now have a persistent traffic, centering on the 'hippie' element and college campuses. . . .

"Charged with the responsibility for the health and safety of its citizens, the various State legislatures have enacted programs for controlling possession and sale of marihuana by finding that marihuana and such drugs as those of the opium family have sufficiently similar social and physiological effects to warrant proscription in a single category labeled 'narcotics'.

"In the course of developing their statutory schemes, the legislators were recipients of a substantial amount of information bearing on the social and physiological effects of marihuana. The Uniform Narcotic Drug Act, including the proscription against marihuana as a 'narcotic', is now in force in 48 of the States. The other two States also control marihuana under statutes similar to the control of narcotic drugs.

"What is the right of States to classify marihuana as a 'narcotic'? Despite some psychological and physiological differences in the effects of the drugs in the opium family and marihuana, the inclusion of marihuana in the statutory definition of 'narcotic' is not constitutionally improper. The word 'narcotic' is commonly used to designate drugs *having the consciousness-altering characteristics of marihuana, i.e., stupor, mental lethargy, marked alterations of mood,* and possible physiological harm.

"The issue was presented and considered by the Supreme Court of Colorado in the case of *People* v. *Stark,* 157 Colo. 59 [400 P.2d 923] (1935) (*en banc*). That court sustained the Colorado Narcotic Drug Act against the appellant's challenge that the inclusion of marihuana in a class with heroin and other physically addicting drugs was an unreasonable and arbitrary classification violative of due process and equal protection of the law. Noting that its statute was in the language of the Uniform Narcotic Drug Act, the court observed that legislative classifications are constitutional when based on a grouping of disparate items, if these items all bear some reasonable relation to the public purpose sought to be achieved by the legislation involved. It concluded that the use of marihuana and other drugs identified in the statute presented such a substantially similar danger to the community that the legislature could properly proscribe them in a single category . . . .

"It, therefore, seems conclusive that the term 'narcotic' as currently used, is a legal term with no precise technical meaning, and it is used to describe a varied assortment of harmful and dangerous drugs. There is a problem of semantics, but the classification should not be upset merely because it is not made with mathematical nicety or because in practice the equating of marihuana and the drugs of the opium family results in some inexact reasoning. The wide degree of judicial accord is an indication that the classification of marijuana with the drugs of the opium family is a rational use of the legislature's power.

"In developing their programs, the legislators are not bound by any one school of thought, nor are they bound to rely on only uncontroverted factual propositions. So long as the legislation rests on some rational basis, it is not to be declared unconstitutional. It is beyond dispute that the legislature, and not the courts, has the duty to assess and weigh the various and often conflicting considerations in legislative programs. *Katzenbach* v. *Morgan,* 384 U.S. 641, 653 [16 L.Ed.2d 828, 837, 86 S.Ct. 1717] (1966). The legislature is not bound by any orthodoxy, but rather can range over the whole spectrum of human knowledge and experience in developing its legislature programs. 'It makes no difference that . . . facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate such contrarity.' *Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 357 [60 L.Ed. 679, 687, 36 S.Ct. 370] (1916).

"Thus, all defendant-appellants have an extremely heavy burden to carry. It will not suffice to show merely that a body of scientific opinion, however sizable and respected, regards the legislative assumptions about the social and physiological effects of marihuana to be incorrect. Rather, the appellants must show that the assumptions are completely without support; that is, that no reputable body of opinion whatsoever exists on which the legislature might have rested its decision to proscribe marihuana in a statute dealing with drugs 'narcotic' in character.

"The information available to the legislators at the time of the enactment of the inclusion of marihuana within the proscriptions against marihuana was abundant. The legislative history of the United States Congress in enacting the Marihuana Tax Act of 1937, reveals there was a great deal of agreement among medical and scientific groups concerning the harmful effects of marihuana. The Seventy-fourth and

Seventy-fifth Congresses were the beneficiaries of a large volume of material describing a variety of different experiences with marihuana, both in controlled environments and in real life.

"In 1942, the National Conference of Commissioners on Uniform Laws recommended that marihuana be included in the controls of the Uniform Narcotic Drug Act. The legislative histories in the various States will also support the proposition that a rational basis for controlling marihuana existed at the time of the enactment of their statutes.

". . . . . . . . . . . . . . . . .

"The formal list of reported physiological and psychological effects of the intake of marihuana is quite varied and lengthy. For example, the 1965 report on Drug Dependence for the World Health Organization lists the following:

'Among the more prominent subjective effects of cannabis . . . are: hilarity . . . carelessness; loquacious euphoria . . . distortion of sensation and perception . . . impairment of judgment and memory; distortion of emotional responsiveness; irritability, and confusion. Other effects, which appear after repeated administration . . . include: lowering of the sensory threshold, especially for optical and accoustical stimuli . . . illusions, and delusions that predispose to antisocial behavior; anxiety and aggressiveness as a possible result of the various intellectual and sensory derangements; and sleep disturbances.'

"It is the effects upon the central nervous system which are most profound, but which have been the least explored by research. Little is known about the psychopharmacological aspects of marihuana, even though it has been the most widely used psychoactive drug in the world. However, there is still a lot of literature indicating its effects are detrimental to the central nervous system. For example, Dr. Donald Louria in his book *Nightmare Drugs* states that marihuana may produce all of the hallucinogenic effects of which LSD is capable.

"A medical symposium sponsored by the Ciba Foundation in 1965, summarizes much of the current research and opinions of leading medical authorities. Included in the conclusions of these studies, are the following comments:

'One can easily imagine the difficult situation to which society would be condemned if the selling of hashish were legal.

'It is well known that taking hashish causes both pathological and psychic disturbances, thus rendering the addict a burden to society.'

"Research conducted by Dr. Harris Isbell, et al., on human beings using a natural occurring tetrahydrocannabinol of marihuana, which he calls THC, has led to the conclusion that in sufficient dosage the properties of marihuana 'can cause psychotic reaction in almost any individual'.

"Because of these *findings, marihuana has earned a reputation* for inducing criminal behavior. One prominent team of researchers which has studied the problem in India where there has been long and widespread abuse of marihuana in all of its potent forms concludes that:

'Excessive indulgence in cannabis is apt to produce in healthy individuals and more so in susceptible individuals, mental confusion which may lead to delusions with restlessness and disordered movements. Intellectual impairment as well as disorientation may show itself in various ways, such as weakening of moral sense, habit of telling lies, prostitution, theft, pilfering, sex perversions and other disgraceful practices. Sometimes indulgence may release subconscious impulses and lead to violent crimes.'

" . . . . . . . . . . . . .

"The manner in which marihuana causes or induces criminal behavior is not clear and seems to vary with the individual, the dosage, and the circumstances. A general survey of the literature indicates that it may stimulate criminal conduct in any of the following ways: (1) use by criminals to fortity [*sic*] their courage prior to committing crimes: (2) chronic use resulting in general derangement and demoralization; (3) use resulting in the lowering of inhibitions and bringing out suppressed criminal tendencies, and (4) use resulting in panic, confusion or anger induced in otherwise normal persons who have not been previous users.

"A psychoactive drug such as marihuana does different things to different people, and even to the same person, depending on external and internal circumstances. Environmental and psychological factors, mood, disposition, attitude, suggestion, expectancy, motivation, and any abnormal behavioral patterns will determine the drug's effects. As stated by J. H. Jaffe, 'The subjective effects (of marihuana) are exquisitely dependent, not only on the personality of the user, but also on the dose, the routine of administration, and the specific circumstances in which the drug is used'. . . .

" . . . . . . . . . . . .

"One particularly grave danger of habitual marihuana use is that there is often a clear pattern of graduation from marihuana to the stronger addictive opiates. Those who seek per-

sonal well-being and exhilaration through the stimuli of drugs ultimately discover that the opiates have more to offer. This point has been disputed, of course, particularly in the case of student experimentation. Certainly, it is true that not all persons who ever smoked a marihuana cigarette have gone on to the use of heroin, but actual experience leaves little room for doubt that a large majority of addicts began their drug taking with marihuana. This pattern of graduation has been observed in the United States, the Near East, and in Africa, though admittedly, the exact causal connection is unknown. In a sample of 96 heroin users examined in the United States, 83 admitted to the use of marihuana prior to their addiction. " . . . .

"Marihuana does differ significantly from the opium and 'opiate' classes of drugs in that it does not produce addiction of the morphine type. Abstinence does not produce a physiological withdrawal syndrome in the user, however, its use does result in a psychological dependence, and according to Dr. David Ausubel, chronic users go to great lengths to insure that they will not be without the drug. Moreover, deprivation may result in 'anxiety, restlessness, irritability, or even a state of depression with suicidal fantasies, sometimes self-mutilating actions or actual suicidal attempts', all symptoms of a psychological withdrawal syndrome. For these reasons, marihuana is more often said to be habituating rather than addicting, although one investigator claims, that at least from a psychiatric point of view, there is little difference. It is somewhat incredible that the lack of physical dependence liability has been cited by some observers as though it were a positive virtue of marihuana.

"One argument used by the permissivists that strikes many observers as naive is the comparison of marihuana and alcohol. Their reasoning is, 'What is so bad about marihuana, it is no worse than alcohol'. The best reply to this is that *a public health problem is not the less odious because it is sanctioned by a majority of the people.* Before accepting the argument that marihuana is no worse than alcohol, one must consider the price paid by society for its inability to control abuse of alcohol. While no one can envisage return to Prohibition as a politically achievable goal, and very few would desire it even if such were the case, the fact is that according to the Public Health Service there are today some 5 million chronic alcoholics. These in turn adversely affect the lives of at least 20 million other persons, principally members of their families.

One half of the annual toll of fatal accidents, or the death of more than 26,000 people, can be attributed in some measure to alcohol abuse. Over one half of all crime in the United States has been said to be connected with alcohol. Despite all this, alcohol has been socially acceptable in our civilization for many, many years. This does not necessarily mean that now for the first time marihuana, the recent fad of isolated groups of pseudo intellectuals and hippies, should gain social acceptance. The result in any case can only be added damage from a new source. We now have more than 62,000 reported active narcotic drug addicts, untold thousands of amphetamine and barbiturate abusers, and millions of persons who drink too much alcohol. That seems to be quite enough." (Italics added.)

In *People* v. *Mistriel,* 110 Cal.App.2d 110, 112 [241 P.2d 1050], where a similar argument with reference to the statute having to do with the possession of marijuana was presented the court said: ". . . the possession of marihuana is, by statute, a public offense. The Legislature is empowered to enact such a statute.

"As stated in the *Matter of Yun Quong,* 159 Cal. 508, at page 515 [114 P. 835, Ann.Cas. 1912C 969] : ' [T]he validity of legislation which would be necessary or proper under a given state of facts does not depend upon the actual existence of the supposed facts. It is enough if the law-making body may rationally believe such facts to be established.' " See also *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152 [82 L.Ed. 1234, 1241, 58 S.Ct. 778], where it is said that legislation ". . . is not to be pronounced unconstitutional unless . . . it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 3, 1968.