[Crim. No. 11925. First Dist., Div. Three. Nov. 21, 1973.]

In re DORIAN C. JONES on Habeas Corpus.

**COUNSEL**

Arthur Leinwohl for Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Derald E. Granberg and John C. Davis, Deputy Attorneys General, for Respondent.

**OPINION**

**CALDECOTT, J.** — The petitioner is now imprisoned in Soledad State Prison following a conviction on pleas of guilty to two counts of violation of Health and Safety Code section 11531,[1] sale of marijuana. The only issue presented by this petition for habeas corpus is whether the imposition of a sentence of five years to life in this case constitutes cruel or unusual punishment.

This question has been presented to Courts of Appeal of California in numerous cases and as stated in *People* v. *Sheridan* (1969) 271 Cal.App.2d 429, 431 [76 Cal.Rptr. 655]: ". . . statutes dealing with marijuana have repeatedly withstood attacks concerning their constitutionality, including claims that the statutes violate the due process and equal protection clauses and that the punishments prescribed are cruel and unusual. (See *People* v. *Oatis,* 264 Cal.App.2d 324 [70 Cal.Rptr. 524]; *People* v. *Cuellar,* 262 Cal. App.2d 766 [68 Cal.Rptr. 846]; *People* v. *Aguiar,* 257 Cal.App.2d 597 [65 Cal.Rptr. 171]; *People* v. *Keller,* 245 Cal.App.2d 711 [54 Cal.Rptr. 154] . . . .)"

As stated in *People* v. *Cuellar* (1968) *supra,* 262 Cal.App.2d 766, 769-770: ". . . the Legislature is now holding hearings concerning the punishment for the possession of, use of, and trafficking in marijuana. This is where the matter of proper penalty should be determined, since this court is in no position to hold hearings and take evidence bearing on the controversial question of the effect marijuana has upon the individual and upon society."

The only California Supreme Court case we have been able to find that concerns the sentencing of a defendant convicted of selling marijuana is *People* v. *Benford* (1959) 53 Cal.2d 1 [345 P.2d 928]. The court in *Benford* stated at pages 15-16: "The punishment to which this defendant has been sentenced is imprisonment from 10 years to life, for section 11713[2] of the Health and Safety Code prescribes that punishment for 'Any person convicted under this division for . . . furnishing . . . any narcotic' where he 'has been previously convicted of any offense described in this division' and the previous conviction is 'found to be true by the court.' This punishment seems very harsh for a defendant who, without benefit or profit to himself, furnished the comparatively small amount of marijuana obtained by this defendant at the request of and for the officer, and who

---

[1]Section 11531 has now been renumbered as 11360.

[2]This section was later incorporated into section 11531.

had suffered a conviction for possession of marijuana seven years before. . . . However, as the trial judge aptly stated when he imposed sentence, 'until the legislature sees fit, or the People of the State of California see fit, to change the laws, it is my duty as a judge and under my oath to follow the laws as the People of the State of California have made them.' "[3]

The cases cited above were all decided before *In re Lynch,* 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] and *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] and emphasize it is the function of the legislative branch, not the courts, to prescribe punishments. *Lynch* and *Anderson* have modified this rule.

In *Lynch* the court stated at pages 414-415: "We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone. (*People* v. *Bauer* (1969) 1 Cal.3d 368, 375 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1]; *People* v. *Tanner* (1935) 3 Cal.2d 279, 298 [44 P.2d 324].)

"Yet legislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition. As we concluded in *People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880], 'The Legislature is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function.' [Citations omitted.]

"We add that the determination of whether a legislatively prescribed punishment is constitutionally excessive is not a duty which the courts eagerly assume or lightly discharge. Here, as in other contexts, ' "mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." ' (*In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296], and cases cited.)"

---

[3] As *Benford* involved punishment for a second offense, not a first offense, as in the present case, we do not feel that the rule of *Auto Equity Sales, Inc.* v. *Superior Court,* 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937], holding that courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction is applicable here.

"Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' (*Robinson* v. *California* (1962) *supra,* 370 U.S. 660, 676 [8 L.Ed.2d 758, 768, 82 S.Ct. 1417] (concurring opinion of Douglas, J.); *In re Finley* (1905) *supra,* 1 Cal.App. 198, 202 [81 P. 1041]), i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch, supra,* at pp. 423-424.)

"We conclude that in California a punishment may violate article I, section 6, of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* at p. 424.)

In *In re Lynch, supra,* the court pointed out certain techniques used in administering the above rule. First, the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. Second, a comparison of the challenged penalty with punishments prescribed in the same jurisdiction for different offenses which must be deemed more serious. Third, a comparison of the challenged penalty with the punishment prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision.

As a defendant under an indeterminate sentence is in effect sentenced to the maximum term provided by law, the constitutional validity of the sentence must be judged by that maximum. (*In re Lynch, supra,* at p. 419.) Health and Safety Code section 11531 prescribes punishment for a first offense violation of imprisonment in the state prison for a period of five years to life. Thus, for present purposes we can deem this petitioner to be serving a sentence of life imprisonment.[4]

## I

A consideration of the first technique raises the question of whether or not marijuana is a danger to society. The biological and psycho-pharmacology effects of marijuana have been a subject of myth and speculation. Various studies and reports have attempted to analyze the problem but with

---

[4]Actually section 11531 provides for a minimum prison term "of not less than three years."

little success. One of the difficulties encountered was the fact that as the use of marijuana was illegal there was no standardization of pharmacological potency and the amount of active drug, tetra-hydro-cannabinol (THC), actually consumed by a user was not known. Apparently the active drug was not isolated in pure form until 1964 and even today a method of determining the THC blood concentrate has not been developed. Without knowing the amount of drug consumed at a given time or the cumulative amount consumed over a period of years a scientific determination of its effect was difficult. Very little American data exists on the duration of marijuana use. Practically no data exists which demonstrates the extent that persons who initiated marijuana use some 20 to 40 years ago have continued its use. The majority of the youthful users and many of the adults have used the drug less than 10 years and probably less than 5 years. The appellate courts are not in a position to hold hearings and take evidence on the question of the effect of marijuana on an individual or on society. If, however, the facts are clear we then must be guided by them. If there is a conflict in the evidence or more study is necessary to reach a meaningful conclusion then it is not for the courts to say that the Legislature's determination of the penalty is wrong as a matter of law. The question thus presented relates to the danger of marijuana to the individual and society.

Petitioner has cited and relies heavily on the recent report of the National Commission on Marihuana and Drug Abuse,[5] which petitioner states is viewed by many authorities as the most comprehensive study on the subject. In 1970 the United States Congress established the Commission on Marihuana and Drug Abuse. In March 1972, the commission filed its first report.[6] As stated in the report, "Congress created the Commission on Marihuana and Drug Abuse to separate fact from fiction, reality from myth, and to achieve a balanced judgment on the marihuana issue." According to the report, marijuana when used in low or moderate doses[7] produces minimal acute physiological effects. There is an effect on cardiac rhythm, a fine tremor and ataxia, but these effects are not permanent. The report also cites many serious problems that can arise from the use of marijuana.

### Genetic and Birth Defects

Much concern about possible effects on the unborn generation has arisen because of the marijuana use by persons in the reproductive years. Pres-

---

[5]Public Law 91-513 91st Congress, H.R. 18583.

[6]"Marahuana: A Signal of Misunderstanding. The Technical Papers of the First Report of the National Commission on Marihuana and Drug Abuse. March 1972."

[7]The commission's report does not define "low to moderate doses."

ently, most studies are preliminary. The commission's report cites three cases of birth defects in man in the offspring of parents who had used marijuana and LSD. The report concludes, however, that "a causal relationship cannot be attributed to marihuana or anything else."[8]

Marijuana has been implicated as a teratogen in animals by several groups at high doses. One study showed reduced fertility in rats impregnated after being fed a diet containing marijuana extract for many months. Pregnant mice inflicted with cannabis resin caused stunted, but not malformed offspring. A second experience using rats produced a high frequency of malformed progeny. Another investigation demonstrated congenital malformations in fetal hamsters and rabbits after large multiple doses of cannabis extract. Studies with radioactive labeled THC indicated that it did cross the placenta in high concentrations early in gestation during the developmental labile phase.

*Psychosis*

The commission's report cites a number of studies, both foreign and U.S., on the relationship of psychosis and marijuana use. The report points out that the findings of the foreign studies are often questionable due to lack of controls, biased sampling and poor data collection and failure to account for variables, such as nutrition, living standard, cultural factors and socio-economic status. These studies, for what they are worth, do show a definite relationship between marijuana use and psychosis. Some of the studies apparently are reliable. According to the commission's report the Indian Hemp Commission performed a thorough and objective investigation of the question. The commission examined all admissions to Indian mental hospitals for one year. They found that cannabis use was a factor in from 7 percent to 13 percent of all cases of both acute and chronic psychosis. A study in Nigeria showed that 14 percent of the psychiatric admissions used cannabis. Toxic psychosis accounted for one-half of these and cannabis was felt to aggravate underlying schizophrenia. Several statistical studies in other countries including Jamaica, Colombia, Algeria, Panama and Tunisia support this type of data.

The commission's report states: "Experience in the U.S. and Western Europe has not involved a level of marihuana use comparable to the

---

[8]In several places in the report the statement is made that the conclusions reached in certain of the studies had no causal relationship to marijuana or that there might be other explanations for the results found. The commission's position differing from that of the studies, would at the most, merely create a conflict in the evidence and not authorize the courts to substitute their determination of the penalty for that of the Legislature.

above-mentioned countries. Consequently, the associated chronic psychotic disturbances have not been seen." The commission does cite reports that show "acute psychotic episodes with clear-cut onset during the marihuana intoxication." Most symptoms cleared within a few days, although several had prolonged illnesses. A few cases of marijuana psychosis that were reported recovered very slowly after extensive psychotherapy. "However, the high incidence of schizophrenia and borderline states described in these patients and their families may indicate that marihuana use merely aggravated or precipitated an underlying psychosis in these individuals." Several other reports indicate an aggravation of schizophrenic condition by the use of marijuana. Several authors have reported acute toxic psychosis following marijuana use by soldiers in Vietnam. Again there were indications of underlying personality disorders.

A questionnaire study of 2,700 psychiatrists, psychologists, internists and general practitioners in the Los Angeles area reported 1,887 "adverse reactions" to marijuana in an 18-month period. "Adverse reactions" was not defined by the authors of the survey. Those reports ranged from mildly unpleasant parental objections to use to severe anxiety or acute psychosis.

 In summary, the evidence seems clear that the use of marijuana will aggravate or precipitate an underlying psychosis. The amount of drug consumed to activate this reaction is not defined by the studies. In the normal, stable. well-integrated person marijuana apparently will not produce a psychosis.

### Amotivational Syndrome

Another type of possible mental deterioration or subtle personality and behavioral changes associated with heavy long-termed cannabis use, is the amotivational syndrome. Its most extreme form depicts a loss of interest in virtually all activities other than cannabis use. "Recently the term has been used to describe the behavior of numbers of young Americans who are for a variety of reasons dropping out of school, refusing to prepare themselves for traditional adult roles and smoking marihuana.

"This type of social maladjustment is not comparable in magnitude to that described in other cultures. However, the individual may lose the desire to work, to compete, to face challenges. Old interests and concerns are lost and the individual's life becomes centered around his compulsive drug use. In addition, the individual may ignore personal hygiene, experi-

ence loss of sex drive and avoid social interaction. (Mirin et al., 1970; Smith, 1968).

"West (1970) and McGlothlin and West (1968) have described a clinical syndrome as a result of observations of regular marihuana users for four years. Their clinical impressions are that these individuals show subtle changes in personality over time which might represent an organic syndrome. These include diminished drive, lessened ambition, decreased motivation, apathy, shortened attention span, loss of effectiveness, introversion, magical thinking, derealization and depersonalization, decreased capacity to carry out complex plans or prepare realistically for the future, a peculiar fragmentation in flow of thought, and a progressive loss of insight.

"Another psychiatrist, Powelson (1971), has also concluded on the basis of over five years clinical experience with drug users at the University of California, Berkeley, that the effects of marihuana are cumulative. He feels that after a period of prolonged use a disorder of thinking characterized by a lack of coherence and a pathological thinking process results. . . .

"Kornhaber (1971) believes that at least twice-daily marihuana use for a year, in a 13-to-18 year-old population, has a deleterious effect upon the developing adolescent. The intoxicated state facilitates a regression from logical-mathematical thought processes to a more primitive conceptual mode of fantasy and magical thinking and impairs learning ability and judgment by decreasing attention and concentration. Thus, the developing youth turns away from reality toward fantasy and from structure and activity to passive dependency."

From the report of the commission there is clear and definite evidence that marijuana is a dangerous drug particularly when used by persons with pre-existing borderline personalities or psychotic disorders, by young people in their formative years and perhaps by women of child-bearing potential.

■ The courts should not interfere in the setting of punishment unless a statute prescribes a penalty so out of proportion to the offense as to violate the prohibition against cruel and unusual punishment. " ' "[M]ere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." ' " (*In re Lynch, supra,* pp. 414-415, quoting from *In re Dennis M.,* 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296].)

■ With the dangers that can be involved in the use of marijuana,

we cannot say that the penalty prescribed in this case, though harsh and severe, is out of proportion to the offense.

The gravity of the offense involved in the present case is readily distinguishable from indecent exposure, the offense involved in *In re Lynch*. The court in *Lynch* pointed out that "[c]linical studies 'support and confirm the traditional legal provisions which have treated this behaviour as a social nuisance, as disorderly conduct rather than an offence [*sic*] causing personal injury.' " (*Lynch, supra,* at p. 430, quoting from Gigeroff, Mohr, and Turner, *Sex Offenders on Probation: The Exhibitionist* (1968) 32 Fed. Prob. (No. 3) 17, 21.)

" 'The vast majority of exhibitionists are relatively harmless offenders; mostly they are public nuisances and sources of embarrassment.' " (*Lynch, supra,* at p. 430, quoting from Report of Karl M. Bowman, Medical Superintendent of the Langley Porter Clinic, in 2 Assem. J. (1951 Reg. Sess.) p. 2847.)

"Finally, although indecent exposure is not a 'victimless' crime, any harm it may cause appears to be minimal at most." (*Lynch, supra,* at p. 431.)

*Lynch* also considers as relevant in determining the reasonableness of the sentence the defendant's individual personality and history. The court cited the Michigan case of *People* v. *Lorentzen,* 387 Mich. 167 [194 N.W.2d 827], in which a young defendant living with his parents, employed at General Motors, who had no prior criminal connections was given a *mandatory minimum* sentence of 20 years for selling marijuana.

In the present case the sentence was not a mandatory sentence of life imprisonment imposed without consideration of the individual defendant. A probation report of 11 pages had been prepared which included, in addition to the report of the probation officer, a letter from the petitioner and a letter from the chief of police. There was also before the court a declaration by petitioner's psychiatrist. The report was read and considered by the court. From the petitioner's statement to the probation officer, it appears that the petitioner at the time of arrest was 24 years old, had been married and divorced, was living with a friend in Los Altos, had used marijuana and LSD, the latter of which he had used on approximately 50 occasions, and had tried numerous other drugs. He listed his occupation as service station attendant. Petitioner states he did not sell marijuana for profit.

The chief of police in a letter to the probation officer states a known

addict was overdosed at petitioner's residence and committed to Agnew State Hospital. Petitioner has been seen in the last two years in company of users and has been mentioned as a dealer. Petitioner could deal in kilo quantities and was also dealing in LSD. Seventeen tablets of LSD were found in his apartment at the time of his arrest. Petitioner was dealing to a large group of people in their late teens to early 20's. Petitioner was considered to be a major supplier of marijuana in the city. The above information taken from the probation report shows there was an individual consideration of petitioner and his background. It is questionable that the trial judge believed the petitioner was a small retailer or sold marijuana without profit.

## II

The second technique used by the courts is to compare the challenged penalty with the punishments prescribed ·in the same jurisdiction for a different offense which by the same test must be deemed more serious. If more serious crimes are punished less severely, then the challenged penalty is to that extent suspect. In the present case, as pointed out by petitioner, there are a number of serious crimes punishable by life imprisonment, i.e., murder, first degree; murder, second degree (Pen. Code, § 190); kidnaping for ransom or robbery (Pen. Code, § 209); robbery (Pen. Code, § 213, § 213, subd. 1, § 213, subd. 2); assault with a deadly weapon (Pen. Code, § 245, subd. (a), § 245, subd. (b); rape (Pen. Code, § 264); and burglary if bodily harm is inflicted (Pen. Code, § 461). All other crimes have a lesser penalty. The criteria here is the danger involved in marijuana use. Most of the offenses listed above are more serious crimes than marijuana use or sale, although some of them, assault with a deadly weapon, can be less serious and in fact involve no injury or harm to the victim. The Attorney General concedes, and we agree, that this technique weighs in the petitioner's favor. From our reading of *Lynch,* however, we do not believe the techniques were intended as absolute rules but were offered as guides to be used in testing the validity of a penalty.

## III

The third technique discussed in *Lynch* is a comparison of punishments in other jurisdictions. Of the 50 states, 14 prescribe penalties for sale of marijuana of 20 years or more and six states prescribe life imprisonment. Of the four states bordering Mexico, three of the four prescribe life. According to the commission's report, 75 percent to 90 percent of the marijuana in the United Sates comes from Mexico and the greatest problem exists in those states closest to Mexico. The availability of marijuana is

greatest in these border states as shown by the low price and the number of marijuana-connected arrests. The current price for a kilo of marijuana is $150 to $200 in the borderline states, while it is $225 to $275 in most other areas of the country according to the commission's report. Also, marijuana arrests are highest in these states, California alone accounting for approximately 25 percent of all these arrests in the United States. Where a problem exists in a state, the Legislature logically will take such steps as are available to alleviate it and it is reasonable that a more severe penalty would be levied in these critical areas on the persons responsible for the problem.

The petition is denied.

Draper, P. J., concurred.

**BROWN (H. C.), J.**—I dissent.

Petitioner Dorian C. Jones has served one year and seven months of a sentence of five years to life in Soledad after pleas of guilty to two counts of selling marijuana. This matter is properly before us on a petition for writ of habeas corpus, based upon the contention that the sentence for a first offense of selling marijuana constitutes a violation of the California constitutional proscription against imposition of cruel or unusual punishment. (Cal. Const., art. I, § 6.) This claim must be tested by the rule of *In re Lynch,* 8 Cal.3d 410, 415-416 [105 Cal.Rptr. 217, 503 P.2d 921], that a defendant under an indeterminate sentence has, in effect, been sentenced to the maximum term provided by law and that the constitutional validity of the sentence must be judged by that maximum. Petitioner herein, thus, must have his sentence tested by the maximum term possible, life imprisonment.

It is to be noted at the outset that petitioner was sentenced on June 2, 1972. The trial court thus did not have the guidelines relative to determining cruel or unusual punishment as set forth in *In re Lynch, supra,* decided December 1972. This appellate court also has, as a part of the record on appeal, the National Commission's Report to the President and Congress of the United States, aptly entitled "Marihuana: A Signal of Misunderstanding."[1] (Public Law 91-513, 91st Congress, H. R. 18583, Oct, 27,

---

[1]The National Commission on Marihuana and Drug Abuse consists of two members of the Senate appointed by the President of the Senate; two members of the House of Representatives appointed by the Speaker of the House; and nine members appointed by the President of the United States. The commission was empowered to employ experts and consultants, appoint necessary personnel and fix salaries. It was directed to conduct a comprehensive study of marijuana—extent of use, number

1970.) Although the commission's first year report was completed on March 22, 1972, knowledge of its availability was probably unknown on June 2, 1972, the sentencing date.)

It is recognized that our Legislature is accorded broad discretion in enacting penal statutes and in fixing the penalties for their violation. It is also settled that those statutes, if consistent with the Constitution, are binding on the courts. It is clear, therefore, that the duty to determine whether the penalties prescribed exceed constitutional limitations is imposed on the courts by both the United States Constitution (Amend. VIII) and the California Constitution (art. I, § 6). The proscriptions against cruel and unusual punishment prevent not only inhuman methods of punishment but also punishment disproportionate to the offenses for which they are imposed.

The techniques or standards for determining whether a punishment for an offense is so disproportionate to the offense as to shock the conscience and to offend fundamental principles of human dignity (as set forth in *In re Lynch, supra*) are: (1) Examination of the nature of the offense and the offender with particular regard to the danger he and his offense present to society; (2) comparison of the challenged penalty with punishment prescribed for offenses in the same jurisdiction which are patently more serious; and (3) comparison of the challenged penalty with punishments prescribed for the same offense in other jurisdictions.

In this dissenting opinion, I shall refer to recent reports on the question of the physical and mental dangers attributable to marijuana users and also to some emotional beliefs concerning its use in answer to the reasons given by the majority of this court for affirming appellant's sentence. These reasons, I believe, have now been totally discredited.

(1) Applying the First Standard, the Petitioner and His Offense Must Be Examined To Determine the Danger He and the Subject Matter of His Offense, Marijuana, Present to Society

Petitioner, at the time of his arrest, was 24 years of age. He had been a resident of California since 1950 and of Santa Clara County for 19 years. He was divorced and was paying $75 per month for the support of his minor child. He had hopes of being granted probation, reconciled with his wife, and enrolled in school to further his education. With the

---

of arrests, an evaluation of existing marijuana laws, whether marijuana was harmful, determine its relationship to vicious crimes and its relationship to other drug abuse. The expenditure on this project was not to exceed one million dollars.

exception of an offense committed when a juvenile of possession of a false ID card, and a motor vehicle violation of driving with a suspended license, petitioner has had no previous criminal record for narcotics arrest or any other offense. The probation officer reported that he had been steadily employed by the North Los Altos Water Company and, more recently, as a service station attendant.

The majority opinion of this court stresses a letter annexed to the probation report from the Los Altos Chief of Police which stated that petitioner was considered a major supplier of marijuana in that town and also dealt in LSD. Petitioner pled guilty so no evidence was adduced concerning any prior activity except that contained in the probation report. The letter of the chief of police is inconsistent with both the probation officer's report and that of the examining psychiatrist and is unsupported by any evidence. The petitioner admitted the use of marijuana but denied ever selling it for a profit. He said that he thought marijuana was harmless and the maximum amount that he ever possessed was one pound. His purpose in selling it was to share it with friends in the social atmosphere of his home. He invited the attention of the court to the fact that he had lived in the county since he was six years of age, attended school in the area and had never been involved in police problems. The known cost of marijuana from wholesalers and his reported selling price to the police undercover agent support his statement that he was not selling marijuana for profit, but at cost. He was examined by a psychiatrist, Dr. Rose, who ascertained that his sales were on a small scale to ingratiate himself with his friends and because of a "prevented sense of altruism." The county probation officer who investigated the petitioner and rendered a report to the court recommended probation. The study of petitioner by Dr. Rose and the investigation of petitioner's offense and background by the probation department clearly indicate that he and his activities did not present a major danger to society. Under the National Commission Report on Marihuana and Drug Abuse, and the report of the American Bar Association (59 A.B.A.J. (1973)) petitioner should be classified as a noncommercial distributor, without profit to himself, and should be treated as a mere possessor, as distinguished from the large-scale dealer, middleman or pusher.

The National Commission Report, quoting from McGlothlin, 1971, pages 29-39, stated at page 603: " 'Several authors have described the distribution of marihuana at the retail level. The majority of persons who use several times per week or more technically have also sold marihuana, although it may be no more than sharing a purchase with friends at no profit. One survey reported that 85% of persons using 3 or more times per

week fall in this category. Others casually sell to a few close acquaintances to earn their own supply and a small amount of money. . . .'" (See 59 A.B.A.J. (1973), pp. 1134-1135.)

The petitioner's life record and his actions do not indicate that he is such a menace to society that he should be sentenced to life imprisonment. The majority opinion, however, states that "[a] consideration of the first technique raises the question of whether or not marijuana is a danger to society" and that the lack of knowledge of the effects of this drug requires the conclusion that it is not for the courts to say that a legislative determination of the penalty is wrong. The majority opinion points to the possibility of genetic and birth defects from long-time use, the possibility of psychosis from abuse by users and the possibility of the "amotivational syndrome" (that is the possibility that long-time use and abuse may reduce users to a state of passive vegetation). The majority point to these possibilities on the ground that there have been no effective or positive reports or studies relative to the effects on long-time users and that, therefore, the Legislature, not the courts, should decide the issue of the danger to society.

The San Francisco Committee on Crime in its 1971 report[2] took an opposite view, stating: "It appears to us that the opposition to change [of the penalties for marijuana violation] . . ." *is based on "not so much a sense of outrage but a fear or terror of something unknown. The majority of the Committee is unable to see in the evidence any valid basis for that fear; the majority does not believe that unsupported fear is enough basis for keeping and trying to enforce laws that divide the generations so sharply."* (Italics added.)

Marijuana, if used excessively and over an extended period of time, may result in physical damage to the user. The danger attendant with use or abuse of marijuana, like the physical damage to the excessive user of alcohol or tobacco, is reason for the dissemination of information to discourage its use and for the imposition of some type of restrictive penalties. The fact that there is a possibility that physical damage may occur, however, is no reason to stigmatize the user as a criminal or to confine him in a prison for a term of years. It is to be noted that the National Commission in its report on the behavior habits of those arrested for marijuana offenses found that most of such arrestees had no prior police contact. The investigation conducted by the National Commission disclosed that

[2]A Report on Non-Victim Crime in San Francisco, Part III, pages 27-28, July 19, 1971. (This report was financed by the Ford Foundation and had as its co-chairmen two prominent San Francisco lawyers, Moses Lasky and William H. Orrick, Jr.)

the arrests for the marijuana violations were the arrestees' initial experience with law enforcement. (See National Commission Report, vol. 2, p. 620.)

The majority opinion places importance on the possibility of an "amotivational syndrome." An earlier report to Congress entitled "Marihuana and Health" from the Secretary, U. S. Department of Health, Education, and Welfare (HEW), March 1971, said in regard to this possibility at page 8 as follows: "The fact that there are many worldwide reports of heavy, chronic cannabis use resulting in loss of conventional motivation and in social indifference is of particular interest in that there are now some reports of somewhat similar findings among American heavy users of marihuana. Unfortunately, American use patterns are frequently contaminated by the use of other drug substances, making interpretation difficult. It is not certain to what degree this 'amotivational syndrome' is the result of marihuana use *per se* or of a tendency for those who lack conventional motivation to find drugs unusually attractive. If one confines his use of the term to a description of the present American scene one must conclude that present evidence does not permit the establishment of a causal relationship between marihuana use and the amotivational syndrome. There is, however, increasing evidence that frequent, heavy marihuana use is correlated with a loss of interest in conventional goals and the development of a kind of lethargy. Research in humans is being conducted in an attempt to determine to what extent this observed correlation is due to an alteration in brain functioning.

"The issue of long-term mental deficit is an exceedingly complex one. The lack of sufficiently sophisticated methodology may be crucial. The problem of determining harmful effects of chronic drug use and especially psychological harm is very difficult. Unless the type of deficit is distinctive or dramatic, it is likely that the same symptoms will be exhibited by many non-drug users. Furthermore, if the harm done to the user is not so gross as to be noticeable in a higher percentage of users, it may readily be attributed to such other factors as poverty or poor nutrition. . . ."

Relative to charges of other physical damage caused by marijuana use, the HEW report states in 1971 that the United Nations Commission on Narcotic Drugs estimated that in 1971 over 200 million people throughout the world made regular use of cannabis (at p. 4). In assessing its harm to the users, it said at page 5: "From the standpoint of lethality, cannabis products must be counted among the safer drugs in widespread use. Death directly attributable to the drug's effects is extremely rare even at very high doses." On the subject of other common misconceptions about mari-

juana, the following findings were stated: There was no evidence to suggest that marijuana use in humans affects fetal development (at p. 7); there was no evidence of withdrawal symptoms when use stopped, even after long usage; evidence of psychoses resulting from heavy cannabis use was rejected because the studies did not meet scientific requirements (at p. 8); there was no evidence to suggest marijuana is cancer producing as is the case with cigarettes (at p. 8). Most marijuana users do not appear to be attracted to the use of heroin; and experienced and naive subject users demonstrated no significant difference in auto driving in acceleration, brake, signal, steering and speed variable as compared to non-drug control subjects. (At p. 62.)

The majority opinion does not contend that use of marijuana is a contributing cause of crime or that its use is a preliminary step to a progression to heroin and other narcotics. In considering the first standard of *Lynch,* the nature of the offense and its danger to society, however, I feel it necessary to discuss both subjects because of widespread public misconceptions which recent studies have shown to be inaccurate.

Most of the laws imposing stringent punishments for marijuana violations were enacted in the various states in the 1930's and 1940's. The very fact that penalties were imposed comparable to those imposed for the crimes of heroin use, robbery, burglary, arson, assault, rape, etc., indicates that the opinion of legislators and law enforcement agencies was that the marijuana user was doing more than causing himself physical damage. It has now been established that the severe penalties were influenced by the belief that marijuana induced vicious criminal tendencies in the user. Although earlier reports (The Indian Hemp Commission in 1894, The Panama Canal Report of President T. Roosevelt in 1914, and the La Guardia Report in 1944) negated such beliefs, it was not until the tremendous increase[3] in the use of marijuana that society was awakened to the necessity for further and more exact study.

One such study is that recently completed by the San Francisco Committee on Crime. In its cover letter to Mayor Joseph L. Alioto, dated July 19, 1971, it was stated at page 3 as follows: "The present restrictive criminal laws on marijuana were adopted in the late 1930's. It was then believed that marijuana made its users into dangerous criminals. *No one who has looked into the subject even slightly any longer believes that.* The

---

[3]The Bureau of Criminal Statistics of the California Department of Justice reported less than 3,500 arrests for marijuana violation in the years prior to 1960. In 1970, the number of arrests increased to almost 70,000, and, in 1972, it rose to more than 72,000 arrests.

present fears about marijuana are, largely, of two kinds: (1) That its use leads to the use of 'harder' drugs, and (2) that it makes its users 'amotivational,' that is, that it reduces its users to a state of passive vegetation. . . . The consensus at the present time is that the deleteriousness of marijuana, or its extent, remains largely unestablished. . . ." (Italics added.)

The 1972 National Commission on Marihuana and Drug Abuse, in its report, commented on the total fallacy of early beliefs[4] concerning the effect of marijuana on the user: "The empirical evidence gathered to date lends no support to the hypothesis that marihuana heightens aggressive tendencies in the user or that its effects significantly increase the likelihood of inciting the user to violence or crime. . . ."

"Although marihuana has been found to reduce inhibitions in some persons, it has not been shown to exaggerate extant aggressiveness to any appreciable degree; in some instances it has, in fact, been shown to reduce aggressiveness, and to induce timidity, fear and passivity in the user (citations)." (At p. 427.)

With relation to major crime and crimes of violence, the report concluded its studies of this aspect of the subject and said at page 432: "There is no reason to believe that marihuana use will cause or lead to the commission of aggressive or violent acts by the large majority of psychologically and socially mature individuals in the general population."

It is also to be observed that marijuana, unlike heroin and the other hard drugs, is relatively inexpensive and does not compel the user to resort to crime to support his habit. Ordinarily, a user does not build up a tolerance that creates a demand for greater amounts to satisfy his appetite for marijuana. (See Lester Grinspoon, M.D., Marihuana Reconsidered (1971) p. 233.)

---

[4]At page 426, the report quotes the following relative to those earlier misconceptions: "The popular and professional literature contains numerous unsupported and often emotionally charged accusations regarding marihuana's contribution to violence.

"In at least two dozen comparatively recent cases of murder or degenerate sex attacks, marihuana proved to be a contributing cause (Anslinger, 1937).

"In a recent study of thirty-seven murders in New Orleans in a year, seventeen were traced directly to marihuana. . . . Evil marihuana is pock-marking this nation with murders, sex attacks, suicides, and crimes in every category from bank stick-ups to petty thievery . . . (LaRoe, 1940).

"Marihuana, while giving the hallucinations of cocaine, adds delusions of impending physical attack by one's best friend or close relatives. In addition, marihuana is intrinsically and inherently crime exciting. It has led to some of the most revolting cases of sadistic rape and murder of modern times (Rowell and Rowell, 1939:67)."

There also has been extreme doubt cast upon the popular belief that marijuana use is but a steppingstone to the use of heroin and other hard drugs.

In the work of Edward R. Bloomquist, M.D., entitled Marijuana, The Second Trip (1971) page 133, he states: "The 'steppingstone' theory which indicates that pot *causes* one to turn to the use of more dangerous drugs, because of something inherent in the chemical structure of cannabis, is as dead as the Dodo bird.

" 'Escalation between cannabis and opiates certainly does occur,' Wilson states; 'those in whom this takes place probably are those mentally unstable individuals who have a predisposition to use drugs and would tend to find satisfaction and an acceptable form of release from their cares and stresses as a consequence of taking a variety of centrally acting drugs.' " (See also John Kaplan, Marijuana—The New Prohibition (1970) pp. 232-233, 258-260; The San Francisco Committee on Crime Report (1971) Part III, p. 10; Marihuana Reconsidered, by Lester Grinspoon, M.D. (1971) pp. 237-252.)

In March of 1972, a Michigan Supreme Court case, *People* v. *Sinclair,* 387 Mich. 91 [194 N.W.2d 878, 885], had this to say about marijuana and its effects as a "stepping-stone" to the use of hard drugs: "Finally, the 'stepping-stone argument' that marijuana use leads to use of 'hard narcotics' has no scientific basis. . . ."

In *Sinclair,* the Supreme Court of Michigan, in reversing a sentence of nine and one-half years and discharging the defendant, two of the judges were of the opinion that classifying marijuana with hard drugs for imposition of penalties denied defendant the equal protection of the law. One judge was of the opinion that it denied defendant the right of liberty and the pursuit of happiness and two judges were of the opinion that the sentence violated the constitutional proscription against cruel and inhuman punishment. (At p. 878.) (See also *People* v. *Lorentzen,* 387 Mich. 167 [194 N.W.2d 827]; *People* v. *McCabe,* 49 Ill.2d 338 [275 N.E.2d 407, 50 A.L.R.3d 1149].)

The National Commission on Marihuana and Drug Abuse also investigated the charge that the use of marijuana led to sex crimes. It stated at page 436: "There is nothing inherent in the drug itself which produces heightened sexual interest, desire or arousal, nor is there any physiological evidence to show that marihuana directly or specifically acts on either the

sexual centers of the brain or the sexual organs. As one observer has noted, marihuana 'is not a sexual stimulant; that is, in the sense that it will not excite mindless, laboratory-located animal tissue' (Goode, 1969:20). In short, marihuana is not an aphrodisiac."

The HEW Report came to essentially the same conclusions as that contained in the 1972 Report of the National Commission on Marihuana and Drug Abuse.

The HEW Report reviewed the data concerning the social and cultural concomitants of marijuana use. It noted the arguments relating marijuana to crime and concluded: "In summary . . . it would seem that cannabis use is a relatively minor contributor to major crimes and violence in any country in the world in which it is used." (At p. 94.)

These studies establish the falsity of past unsupported beliefs which were the product of insufficient information or misinformation. Punishment, regardless of severity, imposed on such a basis is a travesty on justice. If this court, therefore, is to justify the sentence of five years to life imprisonment in the present case, it must do so, in my opinion, on the ground that marijuana is a danger to society, and not on the basis that future studies may disclose the possibility of physical damage to the user in the far distant future from continued use.

In summary: It is concluded in applying the first technique of *Lynch* that the petitioner does not present such a danger to society that he must be imprisoned for a term of life imprisonment, the term by which the petitioner's claim must be judged. (*In re Lynch, supra,* 8 Cal.3d 410, 415-416.) The past unsupported emotional accusations concerning the subject of marijuana have now been exposed as false: The most recent scientific studies now reveal that the use of marijuana does not lead to acts of violence or to the commission of either major or minor crimes. The belief that the use of marijuana is a steppingstone to the use of other narcotics has, for the most part, been dissipated. Nor does its use develop in the user tendencies toward acts of sadistic sexual excesses. The danger of physical damage to the user and development of an amotivational syndrome have not been established. And, finally, marijuana cannot be classified with the expensive hard drugs and narcotics that require the user to resort to crime to support a habit.

I have previously stated that I agree that the use of marijuana should be discouraged but I disagree with the imposition of severe criminal sanc-

tions in order to prevent its use. It is to be observed that, although the severe penal statutes have been in effect for many years, the statistics disclose that the use of marijuana is not being abated, but, in fact, its use is increasing.

 (2) The Second Standard of *Lynch* in Determining Whether the Punishment Is Cruel or Unusual Is To Compare the Prescribed Punishment With the Punishments Imposed for More Serious Crimes

Both the majority of this court and the Attorney General concede that the punishment prescribed for marijuana offenses exceeds the punishment for major crimes, i.e., robbery, burglary, rape, arson, manslaughter, etc. I shall, therefore, limit my comments on this criterion by directing attention to the fact *that the most serious crimes as set forth in our Penal Code, in practically every instance, carry less severe minimum penalties and less severe maximum penalties than the prescribed penalty for a first offense sale of marijuana.* To include the marijuana offender in the same class as the robber, rapist, burglar, arsonist, etc. is shocking in light of present day knowledge. It must be concluded that in applying the standards of *Lynch,* the prescribed punishment for marijuana offenses are major candidates for legislative reform or judicial action.

 (3) The Final Standard of *Lynch* Is To Compare the Punishment in California With Punishment for the Same Offense in Other Jurisdictions

An examination of the penalties in other states for a first offense of sale discloses that 23 states now have a maximum of five years for a first offense marijuana sale. California is one of the few states retaining a maximum life sentence and also the severe minimum of five years. Thirteen states have a maximum of ten years. Fifteen states have a maximum of one year. Twenty states have a maximum of four years. Three have a maximum of fifty years and six have a maximum of life. One state, Oregon, in September 1973, enacted legislation decriminalizing marijuana offenses.

It is also of importance to observe the recent (August 1973) recommendations of the American Bar Association and the State Bar Association of California, and the decisions of the courts of other states when considering the views of other jurisdictions relative to marijuana.

The American Bar Association called for the decriminalization of the possession and "casual noncommercial distribution of marijuana." In the case before us, the first offense sale of a minor quantity of marijuana to

friends for no profit falls within "casual distribution." The State Bar Association of California at its 1972 meeting also called for decriminalization of marijuana offenses.

A number of the Supreme Courts of other states have considered the marijuana problem and have declared unconstitutional the rigorous punishments imposed by trial judges in applying statutory penalties.

In *State* v. *Ward,* 57 N.J. 75 [270 A.2d 1], the appellant was sentenced from two to three years and fined $100 for possession of marijuana. The issue before the court was whether the sentence was excessive even though within the statutory limits. The court held that "[a] sentence of two to three years in State Prison . . . will probably be more detrimental to both the offender and society than some other discipline." (*Id.* at 5.) The court added: "We think that generally a suspended sentence with an appropriate term of probation is sufficient . . . ." (*Id.*) (The New Jersey statutes have imposed a fine not to exceed $2,000 and imprisonment at hard labor for a term of not less than two years nor more than fifteen years.)

In another New Jersey case, *State* v. *Brennan,* 115 N.J.Super. 400 [279 A.2d 900], the appellant was sentenced two to five years for possession and sale of marijuana and appealed the excessive sentence. Here, one of the offenses of possession and sale occurred while he was awaiting trial. The court, in remanding the case to the trial court, referred to *State* v. *Ward, supra,* and commented on certain legislative investigative reports. " '. . . However, laws providing severe mandatory penalties *for all who are technically guilty of selling drugs would prevent the rehabilitation of many of the younger addicts.* This is true because drug users frequently sell small quantities of drugs to friends . . . to supply themselves with enough narcotics to prevent withdrawal suffering.' [57 N.J. at 83, 270 A.2d at 5; italics added.]"

In an Illinois case, *People* v. *McCabe,* 49 Ill.2d 338 [275 N.E.2d 407, 50 A.L.R.3d 1149], the defendant was found guilty of unlawful sale of marijuana and pursuant to that state's statutes was sentenced to the penitentiary for a period of ten years. The Court said at page 411: "Almost all authorities agree that marijuana is not a narcotic or addictive in the sense that the terms are precisely used. . . . The short-hand descriptive phrase most often applied to the drug is 'mild hallucinogen' . . . ." Then at page 413: "Its abuse does not have the . . . ill consequences observed in the use of other drugs . . . . Its use does not . . . extraordinarily lead to opiate addiction or to aggressive behavior or criminal activity." The

court concluded by declaring that the statute was unconstitutional in that it offended the equal protection clause of the United States Constitution.

In a Michigan case, *People* v. *Lorentzen, supra,* 194 N.W.2d 827, the defendant was sentenced to 20 years for the sale of marijuana. The court, on the basis of contentions similar to those raised in *In re Lynch, supra,* considered the punishment for other serious crimes in Michigan. The court held that the sentence imposed on the appellant was disproportionate to the offense. It said at page 832: "Tested by the provisions of other Michigan statutes dealing with offenses . . . against persons or property . . . the present mandatory minimum sentence for the sale of marijuana . . . clearly fails to meet the test of proportionality." The Michigan court also examined the penalties imposed by the legislatures of other states and found that Michigan's penalty was more severe. The court also said, "A compulsory prison sentence of 20 years for a non-violent crime imposed without consideration for defendant's individual personality and history is so excessive that it 'shocks the conscience.' " (*Id.* at p. 834.) The court held that the sentence was cruel and unusual and reversed the judgment of conviction.

In a later Michigan case, *People* v. *Sinclair, supra,* 194 N.W.2d 878, defendant was charged with the sale of marijuana but later reduced to possession. This case reviewed studies concerning the physical effects of marijuana on the user, the psychological effects, the evidence relating to the fact that chronic psychosis cannot be demonstrated, the fact that the user does not resort to crime, and, finally, the theory that marijuana is a stepping-stone to hard drugs. In this case, the Supreme Court referred to five days devoted by the trial court to hearing scientific evidence relating to marijuana. The court, in concluding that marijuana should not be classified with narcotics, said at page 886: " 'Having reviewed all material available to us we find ourselves in agreement with the conclusion reached by the Indian Hemp Drugs Commission . . . (1893-1894) and the New York Mayor's Committee on Marihuana (1944), that the long-time consumption of cannabis in *moderate* doses has no harmful effects.' " (Quoting from British Report, pp. 6-7.) At page 887, the court said: "The truth compels us to conclude . . . that marijuana has been erroneously classified with the opiates, and thus it is clear that based upon current scientific knowledge, marijuana is not a narcotic drug." The judgment of conviction was reversed. The Supreme Court made the following comment at page 891: *"This is an opinion concerning a problem whose time has come."* (Italics added.)

In following the guidelines of *Lynch,* and in reviewing the empirical studies and writings on the subject of marijuana, including the Report of the National Commission on Marihuana and Drug Abuse entitled Marihuana, A Signal of Misunderstanding, and the views of courts of other states, I am convinced that the punishment of five years to life must be considered grossly disproportionate to the offense in light of the knowledge of a progessive society.

Former Justice Cardozo of the Supreme Court of the United States said in his essay in Law and Literature (1931), page 93: "I have faith, nonetheless, that a century or less, from now, our descendants will look back upon the penal system of today with the same surprise and horror that fill our own minds when we are told that only about a century ago (1800's) one hundred and sixty crimes were visited under English law with the punishment of death and that in 1801 a child of 13 was hanged at Tyburn for the larceny of a spoon. Dark chapters are these in the history of law. . . ."

Although present day punishments are, of course, not comparable to those referred to by Justice Cardozo, the penalty imposed here certainly far exceeds the gravity of the offense.

In *Robinson* v. *California,* 370 U.S. 660, 667 [8 L.Ed.2d 758, 763, 82 S.Ct. 1417], the court said: ". . . To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."

I would hold, therefore, that the penalty prescribed in section 11531 of the Health and Safety Code is cruel and unusual and falls within the proscription of the California Constitution, article I, section 6. Section 11716 of the Health and Safety Code would therefore be applicable.

Petitioner has already been confined in excess of the limits of section 11716 of the Health and Safety Code and, therefore, should be released forthwith. I would grant the writ.

Petitioner's application for a hearing by the Supreme Court was denied January 31, 1974.