[Civ. No. 16908. Third Dist. Mar. 14, 1978.]

CARRIE SMITH et al., Plaintiffs and Appellants, v.
THE MUNICIPAL COURT FOR THE STOCKTON JUDICIAL
DISTRICT OF SAN JOAQUIN COUNTY,
Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

**COUNSEL**

Robert N. Chargin, Public Defender, and David Wellenbrock, Deputy Public Defender, for Plaintiffs and Appellants.

Paul Halvonik, State Public Defender, Gary S. Goodpastor, Chief Assistant State Public Defender, Mark L. Christiansen and Michael Lee Pinkerton, Deputy State Public Defenders, as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and William George Prahl, Deputy Attorneys General, for Defendant and Respondent and for Real Party in Interest and Respondent.

**OPINION**

**PARAS, Acting P. J.**—Health and Safety Code section 11550 requires a mandatory 90-day county jail punishment as a condition of probation. Plaintiffs (petitioners in the trial court) contend that this is cruel and

unusual punishment and violates their right to equal protection. We reject their contentions.

Plaintiffs Carrie Smith and Elizabeth Gilbreath are charged in separate San Joaquin County Municipal Court criminal actions with violating Health and Safety Code section 11550,[1] in that on the dates specified they used or were under the influence of a controlled substance, heroin. Violation of section 11550 is a misdemeanor punishable by not less than 90 days, nor more than 1 year, in the county jail. Probation may be granted for a period up to five years, but only on condition that the defendant spend at least ninety days in the county jail. The statute concludes in no uncertain terms: "In no event does the court have the power to absolve a person who violates this section from the obligation of spending at least 90 days in confinement in the county jail."[2]

Plaintiffs, by motion in the Smith case and by demurrer in the Gilbreath case, challenged the mandatory 90-day sentence. Upon rejection of the challenge by the municipal court, they sought a writ of mandate in the superior court. They appealed following denial of their petition.

## I

Our analysis of plaintiff's cruel and unusual punishment argument necessarily begins with the Supreme Court's decision in *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. The court there held that "[a] punishment may violate . . . the Constitution if, although

---

[1]Section references hereinafter are to the Health and Safety Code unless otherwise indicated.

[2]Section 11550 provides in its entirety: "No person shall use, or be under the influence of any controlled substance which is (1) specified in subdivision (b) or (c) of Section 11054, specified in paragraph (11), (12), or (17) of subdivision (d) of Section 11054, or specified in subdivision (b) or (c) of Section 11055, or (2) which is a narcotic drug classified in Schedule III, IV, or V, excepting when administered by or under the direction of a person licensed by the state to dispense, prescribe, or administer controlled substances. It shall be the burden of the defense to show that it comes within the exception. Any person convicted of violating any provision of this section is guilty of a misdemeanor and shall be sentenced to serve a term of not less than 90 days nor more than one year in the county jail. The court may place a person convicted hereunder on probation for a period not to exceed five years and shall in all cases in which probation is granted require as a condition thereof that such person be confined in the county jail for at least 90 days. In no event does the court have the power to absolve a person who violates this section from the obligation of spending at least 90 days in confinement in the county jail." Heroin is a "controlled substance," listed in section 11054, subdivision (c), item (10).

not cruel or unusual in its method, it is *so* disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (Fn. omitted.) (8 Cal.3d at p. 424.) (Italics added.) We emphasize the word "so" because of a not uncommon misconception, shared to some extent by these plaintiffs, that *Lynch* transformed the judiciary into supervisors of penological symmetry. ■ The issue under *Lynch* is not whether a punishment is merely disproportionate, but rather whether it is *so* disproportionate as to *shock the conscience* and offend *fundamental notions of human dignity.*[3]

Because of the almost hopelessly subjective nature of matters of conscience and human dignity, the *Lynch* court adopted three techniques to *aid* in determining whether a given penalty is "shockingly" or "offensively" disproportionate: (1) evaluation of the dangerousness of the offense and the offender to society (8 Cal.3d at pp. 425-426), (2) comparison of the "challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which . . . must be deemed more serious," (8 Cal.3d at p. 426) (italics in original), and (3) "comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* . . . ." (8 Cal.3d at p. 427.) (Italics in original.) We repeat and emphasize that these tests are an *aid* in determining proscribed disproportionality, not in and of themselves conclusive; the ultimate test remains whether the punishment prescribed shocks the conscience and offends fundamental notions of human dignity.

Two salient features of the *Lynch* opinion are noted, for they have taken on increased significance in subsequent cases. First, the sentence condemned there was one imposed on *recidivist* offenders (see *In re Adams* (1975) 14 Cal.3d 629, 637 [122 Cal.Rptr. 73, 536 P.2d 473]). Second, it was the statutory *maximum* of Penal Code section 314 which *on its face* was held unconstitutional because the court felt that no conceivable recidivist exhibitionist deserved a life sentence in prison. The present case involves first offenders who challenge, not the maximum sentence, but a mandatory *minimum.* Plaintiffs rely primarily upon two Supreme Court cases following *Lynch* which deal with such minimum sentences, *In re Grant* (1976) 18 Cal.3d 1 [132 Cal.Rptr. 430, 553 P.2d 590] and *In re Foss* (1974) 10 Cal.3d 910 [112 Cal.Rptr. 649, 519

---

[3]Thus a recent law review comment which concludes that section 11550 is unconstitutional is deficient, inter alia, for failing to address this ultimate question. (See Comment, *California Health and Safety Code Section 11550: Is a 90-Day Mandatory Minimum Jail Term A Cruel Or Unusual Punishment?* (1977) 11 U.S.F. L.Rev. 622.)

P.2d 1073]. The Attorney General relies upon *In re Adams, supra,* 14 Cal.3d 629.

*In re Foss* applied the three *Lynch* techniques to invalidate 10- and 15-year mandatory minimum sentences under section 11501 for recidivist defendants convicted of sale of heroin with 1 or 2 prior narcotic convictions respectively. (10 Cal.3d at pp. 917, fn. 3, 929.)

In *In re Adams,* the Supreme Court refused to extend *Foss* to *first offenders.* Defendant there was sentenced to two consecutive terms, each with a three-year mandatory minimum, for sale of benzedrine and transportation of heroin. The court rejected the contention that the resulting six-year minimum sentence was cruel or unusual under *Foss*: "Unlike the situation in *Foss,* there is no indication in the present record that petitioner was an addict selling drugs to support his habit. Indeed, the large quantities of drugs transported in the single transaction before us suggest that petitioner may have been a major drug supplier. We decline petitioner's invitation to extend our *Foss* ruling to invalidate consecutive mandatory minimum sentences prescribed for *initial* drug offenders." (14 Cal.3d at p. 637.) (Italics added.)

In *In re Grant, supra,* the Supreme Court held that the provision of section 11531 (now § 11360, sale of marijuana), precluding parole consideration for 10 years for *recidivist* offenders constituted both cruel and unusual punishment. In so doing, the court stated: "In light of the indisputably legitimate penological goals of deterrence and isolation of offenders . . . it is manifest that *the Legislature may prescribe reasonable periods of parole ineligibility even for offenses encompassing broad ranges of conduct.*" (18 Cal.3d at p. 12.) (Italics added.) And the Supreme Court summarized the test for finding a mandatory minimum sentence disproportionate under the first *Lynch* technique as follows: "Provisions which preclude parole consideration for specified periods become disproportionate to the offense when they *not only* indiscriminately penalize repeated conduct of widely varying gravity without regard for regularly recurring mitigating factors, *but also* absolutely preclude parole for *substantial* lengths of time in excess of that reasonably calculated to allow for consideration of rehabilitative progress to fulfill other legitimate penological objectives." (18 Cal.3d at pp. 12-13.) (Italics added.)[4]

---

[4]With reference to first offenders the *Grant* court stated: "We express no opinion herein regarding any of the Health and Safety Code mandatory minimum-term

■ Thus for purposes of the first *Lynch* technique, a mandatory minimum sentence is to be considered disproportionate *on its face* (i.e., without regard to the circumstances of the particular offender) when (1) the statute penalizes "repeated" conduct of widely varying gravity without regard for regularly recurring mitigating factors, *and* (2) parole is precluded for a "substantial" length of time in excess of that reasonably calculated to allow for consideration of rehabilitative progress or to fulfill other legitimate penological objectives.

■ The 90-day minimum specified by section 11550 runs afoul of neither of these problems. First, it applies to first offenders, and contains no enhancement for recidivists; second, it is of such short duration that it cannot be deemed substantially excessive to fulfill the legitimate penological objectives of deterrence and isolation, considering the seriousness of the problem of drug use and the obviously constitutional (and unchallenged) one-year maximum.

Moreover, the repeal of indeterminate sentencing, which emphasized reformation and rehabilitation, seriously undermines the emphasis in *Grant* and its predecessors upon the fact that mandatory minima infringe upon the "consideration of rehabilitative progress." (*Grant,* 18 Cal.3d at p. 13.)[5] Indeed, despite the Supreme Court's reliance on "scholarly" opinion that rehabilitation is a major goal of penology, a current attitude in penological writing (which was unquestionably influential in the decision to repeal indeterminate sentencing) rejects individualized "rehabilitative" sentencing in favor of definite, fixed terms without great regard for the characteristics of the individual offender.[6] And the notion is catching on: "Legislatures in more than thirteen states are now

provisions for first offenders. We do note, however, that these provisions for first offenders generally impose mandatory minimum terms of *less than five years,* and do not share many of the defects peculiar to the recidivist provisions. Sections 11353 and 11380, which impose the greatest mandatory minimum terms under the Health and Safety Code for first offenders, proscribe conduct which is uniformly grievous involving as it does the entanglement of minors in drug abuse. (See *People* v. *Carbonie, supra,* 48 Cal.App.3d 679, 687.)" (18 Cal.3d at p. 14, fn. 10.) (Italics added.)

[5]The new Determinate Sentencing Act declares that " 'the purpose of imprisonment for crime is *punishment.*' " (Pen. Code, § 1170, subd. (a)(1); see *Way* v. *Superior Court* (1977) 74 Cal.App.3d 165, 169 [141 Cal.Rptr. 383].) (Italics in original.)

[6]See e.g., American Friends Service Committee, Struggle for Justice: A Report on Crime and Punishment in America (1971); Fogel, We Are The Living Proof (1975) pages 238-245; Frankel, Criminal Sentences—Law Without Order (1973); Mitford, Kind and Unusual Punishment (1973) pages 79-94; Singer & Statsky, Right of the Imprisoned (1974) pages 281-285; Prettyman, *The Indeterminate Sentence and the Right*

considering proposals that emphasize deserved punishment rather than rehabilitation as the goal of the criminal sanction."[7]

## II

We now consider the second and third *Lynch* techniques. Section 11550 is indeed disproportionate in comparison both with other more serious crimes in California and with similar crimes in other states. Nevertheless, *People* v. *Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001], made it clear that the *Lynch* techniques are not to be applied mechanically. That two of the techniques may indicate disproportionality is not conclusive of the issue. When in *Wingo,* the second and third *Lynch* techniques indicated disproportionality, the court stated, "The first *Lynch* test thus becomes dispositive, . . ." (*Wingo,* at p. 180.)

This is so partly because, despite the bright hope of objectivity expressed in *Lynch,* the second and third techniques contain large areas of subjectivity. For example, in the present case, the fact that most states do not punish the use or being under the influence of heroin may simply mean that they do not have the same problem with drug abuse as California. (See *People* v. *Carbonie* (1975) 48 Cal.App.3d 679, 689 [121 Cal.Rptr. 831]; (penalties in metropolitan jurisdictions for narcotics trafficking are most relevant for California); *In re Jones* (1973) 35 Cal.App.3d 531, 541-542 [110 Cal.Rptr. 765], (availability of marijuana in border states justifies harsher penalties).) Likewise, it has been argued that a court may sometimes find disproportionality despite similar punishments elsewhere. (See 10 U.S.F. L.Rev. 524, 535, fn. 74, citing *In re Jones, supra,* 35 Cal.App.3d at p. 547 (Brown, J., dis. on the

---

*to Treatment* (1972) 11 Am.Crim.L.Rev. 7, 17-21; Morris, *The Future of Imprisonment: Toward a Punitive Philosophy* (1974) 72 Mich.L.Rev. 1161; *Senate Bill 42 and the Myth of Shortened Sentences for California Offenders: The Effects of the Uniform Determinate Sentencing Act* (1977) 14 San Diego L.Rev. 1176, 1180-1186; Murray et al., *Prison Reform, Backward or Forward?* (1975) 50 State Bar J. 356.

[7]"The number varies from fifteen to thirty-five, according to the criteria used. At a minimum the following states have or are now considering correctional reforms based on a goal other than rehabilitation: Maine (new criminal code with fixed sentencing became effective May 1, 1976), California (new fixed sentencing law became effective July 1, 1977), Indiana (new fixed sentencing law became effective July 1, 1977), Minnesota (legislature passed a fixed sentencing bill in 1976, but it was vetoed by the governor; new legislation was introduced this year), Alaska, Colorado, Connecticut, Florida, Idaho, Illinois, Ohio, Oregon, Pennsylvania, South Dakota, Virginia, and Washington." Cole, *Will Definite Sentences Make a Difference?* (1977) 61 Judicature 58, 59-60.

ground that marijuana penalties were enacted in a period of general misconception as to the dangers of marijuana).) Moreover, undue deference by us to the judgment of other state legislatures in support of a refusal to defer to our own Legislature raises fundamental questions about democratic values.

Like the *Wingo* court, we find that the indications of disproportionality under the second and third *Lynch* techniques, are insufficient, when viewed in light of the absence of disproportionality under the first *Lynch* technique, to convince us that the 90-day mandatory minimum sentence of section 11550 is unconstitutional. The 90 days minimum does not shock the conscience or offend fundamental notions of human dignity.

## III

Plaintiffs' equal protection argument remains.

In *People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375], the Supreme Court held that personal liberty is a fundamental interest, and that therefore the state was required to show that the differences in sentencing between adults sentenced in adult courts and juveniles "prosecuted *as adults,* adjudged by the same standards which apply to *any competent adult,* and convicted *as adults in adult courts,*" (17 Cal.3d at pp. 242-243, italics in original), but committed to the Youth Authority, were necessary to fulfill a compelling state interest. (17 Cal.3d at p. 243.)

Defendant in *Olivas* was convicted of misdemeanor assault, which provides for a maximum county jail sentence of six months (Pen. Code, § 241). Instead, he was committed to the Youth Authority for a term which (considering that he was entitled to 90 days credit for time spent in jail awaiting trial) ". . . increased the potential duration of his incarceration by a factor of 14." (17 Cal.3d at p. 242, fn. 10.) Such *gross* differences in incarceration for persons *identically* situated presented a classic equal protection issue, which the court resolved by expanding the list of "fundamental interests" to include "personal liberty" and unavoidably concluding that the differences were not necessary to fulfill any compelling state interest. (17 Cal.3d at p. 257.)

■ Even though the 90-day minimum of section 11550 applies even-handedly to all its violators, plaintiffs argue that we apply *Olivas* to

invalidate their 90-day minimum sentence on the ground that "the Legislature has singled out a group of violators, among virtually all persons convicted of crimes in California, and has denied them what is available to all others; the opportunity to be considered for probation instead of a jail sentence, . . ."[8] However, it is one thing to hold, as did *Olivas,* that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally. The latter are not similarly situated for equal protection purposes. Recognition of plaintiffs' attempt to place themselves in the category of ". . . all persons convicted of crimes . . ." would require that every difference in punishment among all criminal statutes be strictly scrutinized.

Such a result goes far beyond the holding of *Olivas,* and commentators agree that "the *Olivas* court probably did not intend to lay the foundation for highly intrusive judicial reexamination of the legislature's criminal justice policy, . . ." (Note, *Extended Incarceration of Youth Offenders* (1977) 65 Cal.L.Rev. 345, 352.) "The court's decision in [*In re Roger S.* (1977) 19 Cal.3d 921 (141 Cal.Rptr. 298, 569 P.2d 1286)], and in particular Chief Justice Wright's reliance on the basic requirement that a challenged statute be shown to affect two similarly situated groups in an unequal manner, clearly demonstrates that the court's earlier holding in *Olivas* that personal liberty is a fundamental interest will not necessarily result in the wholesale invalidation of California's juvenile or criminal justice systems." (Vallandigham, *People v. Olivas: The Concept of "Personal Liberty" as a Fundamental Interest in Equal Protection Analysis* (1977) 4 Hastings Const.L.Q. 757, 766-767.) ". . . *Olivas* was primarily based on the court's disillusionment with the implementation of the rehabilitation ideal . . . it appears likely that restraints will be placed on the new approach making it available only to the general class of 'youthful' offenders as a remedy for eliminating any sentencing inequalities existing in this area of the California criminal justice system." (Note, *People v. Olivas: Equalizing the Sentencing of Youthful Offenders with Adult Maximums* (1977) 4 Pepperdine L.Rev. 389, 407.)

Our own reading of *Olivas* leads us to agree with these comments. *Olivas* was not intended to apply to sentencing inequalities between and

---

[8]Plaintiffs' assertion must be qualified by pointing out that under recent amendments, section 11550 violators are eligible for *diversion,* without regard to the 90-day minimum. (Pen. Code, § 1000, subd. (a); see 11 U.S.F. L.Rev., *supra,* at p. 637, fn. 66, and Spence, *The California Diversion Law* (1977) 52 State Bar J. 320, 324.)

among different offenses. Accordingly, we reject the equal protection claim.

The judgment is affirmed.

Reynoso, J., and Friedman, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 11, 1978. Tobriner, J., and Newman, J., were of the opinion that the petition should be granted.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.