Filed 3/15/17 First modification and unmodified document attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEYANIRA CUIRIZ,<br><br>        Defendant and Appellant. | A144351<br><br>(Contra Costa County<br>Super. Ct. No. 51306067)<br><br>ORDER FURTHER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 14, 2017, be modified as follows:

1. On page 16, in the first sentence of the Disposition, change the words "three" to "four" so that sentence reads:

> "The judgment is modified to vacate the sentence imposed, to strike the 25-year-to-life enhancement from the sentences imposed under counts two and four and stay the sentences imposed under counts two and four, and to vacate the stay with respect to the sentence imposed by the trial court under count one for attempted voluntary manslaughter, imprisonment for a term of 12 years."

There is no change in the judgment.

Dated: _____          _____ Acting P. J.

1

Trial court: Contra Costa County Superior Court

Trial judge: Honorable Trevor White

Counsel for plaintiff and respondent: Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and Arthur P. Beever Deputy Attorney General

Counsel defendant and appellant: Robert H. Derham and Tiffany J. Gates

Filed 3/13/17 First modfiication (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEYANIRA CUIRIZ,<br><br>        Defendant and Appellant. | A144351<br><br>(Contra Costa County<br>Super. Ct. No. 51306067)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 14, 2017, be modified as follows:

1.  On page 4, line 4 of footnote 4, delete the word "mitigated" so that the sentence reads:
    On the attempted voluntary manslaughter count she was sentenced to 12 years (three-year base term plus four years for the firearm enhancement and five years for inflicting great bodily injury).

2.  On page 10, line 21, delete the words "all counts" and insert the words "two of the counts and the midterm on the voluntary manslaughter count" so that the sentence reads:
    The court imposed mitigated base terms on two of the counts and the midterm on the voluntary manslaughter count.

3.  On page 12, line 15, the word "involuntary" is changed to "voluntary."

4.  On page 16, after footnote 12 on line 18, add the following sentence:
    "Upon striking the 25-year-to-life enhancement from both counts under which it was imposed, which we do, this sentence provides for the longest potential term of imprisonment in compliance with section 654."

1

5. On page 16, in the first line of the Disposition, after the word "imposed," insert the words "to strike the 25-year-to-life enhancement from the sentences imposed under counts two and three and stay the sentences imposed under counts two and three" so that sentence reads:

> "The judgment is modified to vacate the sentence imposed, to strike the 25-year-to-life enhancement from the sentences imposed under counts two and three and stay the sentences imposed under counts two and three, and to vacate the stay with respect to the sentence imposed by the trial court under count one for attempted voluntary manslaughter, imprisonment for a term of 12 years."

There is no change in the judgment.

The petition for rehearing is denied.

Dated: _____ Acting P. J.

| | |
|---|---|
| Trial court: | Contra Costa County Superior Court |
| Trial judge: | Honorable Trevor White |
| Counsel for plaintiff and respondent: | Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and Arthur P. Beever Deputy Attorney General |
| Counsel defendant and appellant: | Robert H. Derham and Tiffany J. Gates |

A144351

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>DEYANIRA CUIRIZ,<br><br>      Defendant and Appellant. | A144351<br><br>(Contra Costa County<br>Super. Ct. No. 51306067) |

Defendant Deyanira Cuiriz appeals a judgment sentencing her to imprisonment for 27 years to life following her conviction for attempted voluntary manslaughter, shooting at an occupied vehicle and mayhem. She contends that she did not voluntarily and knowingly waive her right to remain silent when she spoke to the police after having been advised of her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and that the trial court erred in admitting her statements made during the police interrogation and in refusing to excise from the evidence presented to the jury a statement by the interrogating detective. She also contends the sentence imposed constitutes constitutionally prohibited cruel and unusual punishment. We shall affirm the conviction but conclude this is the rare case in which there is merit to defendant's constitutional challenge to the sentence imposed.

**Background**

The record contains extensive testimony from numerous witnesses describing the incident that culminated in the shooting that rendered the victim a quadriplegic. However, a detailed recitation of the evidence is unnecessary in view of the issues raised on appeal.

In brief, the shooting occurred after midnight on August 19, 2012, during the course of defendant's 19th birthday party, outside the Richmond home where she lived

1

with her parents. Although there was conflicting evidence as to what precipitated the incident, it is undisputed that a confrontation occurred between defendant's father (who like others had been drinking at the party) and the victim Oscar Barcenas and his friend Miguel Magdaleno. The father and others were outside in front of the house when Barcenas and Magdaleno drove by in a truck and (for disputed reasons) exited the truck and engaged in a physical confrontation with defendant's father. Defendant emerged from the house, observed the two men hitting and pushing her father and, according to defendant, pushed her when she attempted to separate the men. Defendant testified that she saw her father on the floor with "his face full of blood," she was scared, she said, and yelled at the two men to leave and they threatened to return, telling her they were gang members. Defendant was handed a gun by her boyfriend[1] and approached the truck to which Barcenas and Magdaleno had retreated preparing to leave, and fired one shot into the cab of the truck, piercing Barcenas's spinal cord.

About a half hour after police responded to the scene, defendant approached an officer and, as the officer testified without objection, acknowledged that she had shot the victim. As the officer was handcuffing her, she explained that "she was defending her father and that's why she shot the subject in the vehicle." At trial she testified that as she was standing next to the driver's side of the truck, Barcenas "was coming outside of the truck towards me." She continued, "He looked like he just turned around from looking in his center console. When I turned around, he was already coming out. I was scared." She said she shot "[b]ecause I seen him come out the car and I thought he had something, he was gonna do something to me. I was already scared because he was saying that he's in a gang, and that's really scary to me."

Over defendant's objection, the recording of her interrogation by two detectives at the police station that began at 6:50 that morning was played for the jury. At one point during the questioning, defendant stated that when Barcenas and Magdaleno returned to

---

[1] Defendant originally told the police that she went inside the house for the gun but at trial testified that she had lied in order to protect her boyfriend.

the truck "and they're like, 'Oh I'm so sorry, I'm so sorry,' I was like, 'What the fuck do you mean you're sorry?'. . . [¶] . . . [¶] . . . I was like 'What the hell?' I was like, 'How are you gonna say you're sorry after you come and beat someone's dad not knowing what the fuck is going on?' I was like, 'Fuck that.' And then they were just like, man. They were just saying some of this ignorant stuff. They got on my nerves. And then I just shot the dude. I was like what the hell? Like 'cause he was gonna — he was, like, he was gonna come back outside so I was scared. I was like, 'What the hell?' I just shot him cause he was gonna come back and argue with me." Later in the interrogation: "like we're at the point where I was — where I grabbed — where my hand started shaking. 'Cause like I got mad. Like I got mad and I knew like, I never did nothing to anyone before. But like they were being really ignorant. Like . . . [¶] . . . I don't know why people. And I usually talk about . . . people being ignorant. But my anger got to me. [¶] . . . [¶] Like in desperation and I didn't want them to come back outside and keep doing stuff." When asked why she shot the victim, defendant answered: "Because I was mad. Like I was telling you I was [upset] (unintelligible) he was saying sorry. And the more he said sorry the more he got me mad. 'Cause like it doesn't make sense for you to come hit somebody and say you're sorry and I don't know what you're doing. I knew he was like threatening me, and everything. So I was like, 'What the hell are you talking about.' That's when he was gonna come outside, so I'm guessing he was gonna do something to me. So I just shot him. Like I didn't want anything to happen to me."

Towards the end of the interrogation, defendant volunteered, "It was easily self defense. That's what I chose to do." This prompted additional questions and then the following exchange:

"Q. So you decided to take it into your own hands?

"A. I blacked out, like honestly my temper is . . .

"Q. Hey wait, and real quick, just so you understand . . .

"A. Yeah . . .

"Q. This blacking out thing is a bunch of garbage. You tell me you black out, but you've already told me everything in detail.

3

"A. No, no, I know in detail. (Crosstalk) In between, my mind at the point, I wasn't thinking you know?

"Q. Cause you were so pissed off.

"A. Ya.

"Q. Ok, that's not self defense. Who told you getting pissed off, grabbing a gun, and shooting someone is self defense? Who told you that?"

In an amended information, defendant was charged with attempted murder (Pen. Code, §§ 187, 664),[2] shooting at an occupied vehicle (§ 246), aggravated mayhem (§ 205), and mayhem (§ 203). On each charge the amended information alleged that defendant had personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). As to the attempted murder and shooting at an occupied vehicle charges, the amended information alleged that defendant had personally inflicted great bodily injury (§ 12022.7, subd. (b)). The jury found defendant not guilty of attempted murder but guilty of the lesser offense of attempted voluntary manslaughter, of shooting at an occupied vehicle and of mayhem.[3] The court sentenced defendant to prison for a term of 27 years to life: the mitigated term of two years on the mayhem conviction plus 25 years to life for the firearm enhancement. Sentence on the other charges was imposed and stayed under section 654.[4] Defendant has timely appealed.

---

[2] All statutory references are to the Penal Code unless otherwise indicated.

[3] The aggravated mayhem charge was dismissed on the prosecutor's motion after the jury reported that it could not agree on that charge.

[4] Defendant was sentenced to 28 years to life on the conviction for shooting at an occupied vehicle (mitigated three-year base term plus 25 years to life for the firearm enhancement). On the attempted voluntary manslaughter count she was sentenced to 12 years (mitigated three-year base term plus four years for the firearm enhancement and five years for inflicting great bodily injury). These sentences were stayed pursuant to section 654.

**Discussion**

1. *The recording of defendant's interrogation was properly admitted.*

Defendant first challenges the admissibility of her recorded statements on which the prosecution relied in disputing her claim of self defense. The interrogation in which these statements were made took place in the police station some six to seven hours after the shooting. Defendant had been taken to the station from the scene and apparently had been dozing in the interrogation room before the detectives arrived. At the outset one of the detectives advised defendant of each of her rights specified in the standard *Miranda* warning, asking her whether she understood that right and as to each right defendant responded that she did. Without explicitly asking defendant whether she waived those rights the detectives proceeded with the questioning and defendant unhesitantly answered. Defendant's in limine motion to exclude her statements made during the interrogation on multiple grounds, including that the implicit waiver of her *Miranda* rights was not made voluntarily and knowingly, was denied[5] and a recording of the interrogation was subsequently played to the jury.

On appeal, defendant renews her contention that the recording should not have been admitted because she did not voluntarily and knowingly waive her *Miranda* rights. The recording was not admissible unless defendant's waiver was voluntary and knowing. (*People v. Duff* (2014) 58 Cal.4th 527, 551.) "In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded,

_____

[5] The court did not rule on the motion before the start of trial because the prosecutor indicated he did not intend to introduce the recording. The prosecutor subsequently indicated he did wish to introduce the recording, at which point the court conducted a hearing under Evidence Code section 402 and denied the motion.

5

the facts surrounding the admission or confession are undisputed and we may apply independent review." (*Ibid.*)

In arguing that defendant's waiver was not voluntary and knowing, defendant points to the facts that she "was barely 19 years old at the time of the interrogation," she had "no prior experience with law enforcement or the criminal justice system," she "was emotionally distraught throughout the entire interview and may have been suffering from shock," and it is "at best uncertain whether [she] slept or had anything to eat or drink in the five and a half hours between the time that she was arrested (at approximately 1:30 a.m.) and the time that the interrogation began (at approximately 7:00 a.m.)." However, despite the characteristics of youth that courts have recognized in the numerous cased cited by defendant, defendant had graduated from high school and was an adult and employed at the time of the shooting. Waivers from much younger persons have been upheld. (E.g., *People v. Nelson* (2012) 53 Cal.4th 367, 375; *People v. Lewis* (2001) 26 Cal.4th 334, 384; *In re Joseph H.* (2015) 237 Cal.App.4th 517, 533.) At the section 402 hearing, one of the interrogating detectives testified that at the time defendant appeared to be coherent, not "in pain or anything like it," was not defiant, did not appear hungry and when asked responded she would like some water that was provided her, and appeared to understand all the questions that were put to her. After watching the video recording of the interrogation, the trial court concluded defendant's statement "was knowingly, intelligently, and voluntarily made" and that not "anything that I have in front of me even approaches [the] level" of a constitutional violation. This court has also watched the video recording and in the exercise of our independent judgment reaches the same conclusion. Defendant gave no indication that she did not understand the *Miranda* rights that were read to her, and that she said she understood. Although soft-spoken, she appears to have been fully awake and alert. At no point did defendant indicate any reluctance to answer the detectives' questions. The record contains no evidence that she did not waive her rights knowingly and voluntarily. There was no error in admitting the recording of her interrogation.

2. *The court did not err in failing to excise the detective's statements from the recording.*

Defendant contends that even if the recording of the interrogation was properly admitted, the court erred in failing to excise the detective's statements near the conclusion of the interview that the shooting was "not self defense. Who told you getting pissed off, grabbing a gun, and shooting someone is self defense? Who told you that?" The issue was raised by the court at the end of the section 402 hearing, leading to an extended discussion with counsel concerning how the defense might properly respond. During the exchange defendant's attorney indicated that she preferred the remarks to be stricken. However, the court suggested instructing the jury that the statement was not to be considered as evidence and counsel stipulated to the following instruction: "Statements made by police officers while conducting out-of-court interviews are not evidence. These statements can be viewed as interview techniques and do not express the personal views or opinions of those police officers." The stipulation was read to the jury before the recording of the interview was played, and was repeated in the final jury instructions, at which point the court added: "So if it's a situation with the officers, something the officers have testified to, do keep in mind what sounds like an opinion expressed during that interview is not to be considered by you, because of the stipulation, as an opinion. So I wanted to clarify that point for all of you." Whether or not the objection was forfeited by entry of the stipulation, as the Attorney General contends, any possible prejudice from inclusion of the detective's remarks was cured by the court's instruction. (*People v. Ervine* (2009) 47 Cal.4th 745, 776 ["we presume the jury faithfully followed the court's limiting instruction"].) When the detective who made the statement during the interrogation testified at trial, he expressed no such opinion. And although the prosecutor referred to the statement in closing argument, he did so to suggest that the statement had prompted defendant to change her story, and made no argument that the detective had expressed an opinion that should be considered. There is no reason to believe that the jury did not follow the court's instruction in this case.

7

3. *Defendant's sentence constitutes cruel and unusual punishment.*

Defendant contends that her sentence of 27 years to life constitutes cruel and unusual punishment in violation of the state and federal constitutions. "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489. 496.)

Defendant acknowledges, and we reiterate, that she must overcome a "considerable burden" to show that the sentence is disproportionate to her level of culpability (*People v. Wingo* (1975) 14 Cal.3d 169, 174). Defendant relies heavily on the Supreme Court decisions in *People v. Dillon* (1983) 34 Cal.3d 441(*Dillon*) and *In re Lynch* (1972) 8 Cal.3d 410 (*Lynch*). These decisions have never been disapproved and still state the applicable principles of law, although cases finding a sentence to be cruel or unusual are, as defendant recognizes, "rare." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.) Nonetheless, there are numerous features of this case that are quite unusual.

The presentencing report from the probation department observed, "Despite the defendant's ineligibility for grant of probation, it is noted that the circumstances of this case are disturbing. The instant offense occurred because the victim and his friend interrupted a family party, without invite or welcome. The two men then assaulted the defendant's father, without cause or fear of reprisal from the defendant's family, all the while, yelling at family members in a threatening manner. [¶] When it became evident the two men may be outnumbered, they returned to their vehicle, at which time the defendant shot the driver of the vehicle, the victim. The victim and his friend provoked the defendant, or at the very least, began the altercation by arriving at the defendant's home unwelcome." In an addendum to the report, the probation officer agreed that a prison sentence was appropriate, but "also agree[d] with the jurors[6] and defense attorney that the additional consecutive sentencing is extreme for the circumstances of this particular

---

[6] As indicated below, a majority of the jurors made known to the court that they were shocked to learn of defendant's potential sentence, which they considered extremely unjust in this case.

case." Although the court imposed the mitigated term of two years on the underlying offense,[7] it held that under section 12022.53, subdivision (d) it was required to add the mandatory enhancement of 25 years to life for having used a firearm in the commission of the offense.

The governing principles established in *Dillon* and *Lynch* have been restated numerous times. They are summarized in *People v. Em* (2009) 171 Cal.App.4th 964, 972 as follows: "Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel or unusual punishment.' A sentence may violate this prohibition if ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' (*People v. Dillon*[, *supra*,] 34 Cal.3d [at p.] 47.) [¶] Under the California Constitution, we use a three-pronged test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' (*In re Lynch*[, *supra*,] 8 Cal.3d [at p.] 425.) Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. (*Id*. at pp. 426-427.) Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense."[8] As stated by the Supreme Court in *People v. Hines* (1997) 15 Cal.4th 997, 1078: "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also

---

[7] The court explicitly found applicable the mitigating factors that the circumstances of the offense were unusual and unlikely to recur, that defendant participated in the crime "under circumstances not of coercion but to a certain extent duress," that defendant "has no prior record of criminal conduct," and that she "acknowledged the wrongdoing at an early stage in this proceeding."

[8] *People v. Em* also recognizes that a sentence is cruel and unusual under the Eighth Amendment to the United States Constitution if it is "grossly disproportionate." (171 Cal.App.4th at p. 977.)

consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. (*People v. Dillon, supra*, 34 Cal.3d at p. 479.) If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' (*ibid.*), or, stated another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional."

Both in the abstract and in its particulars, defendant's offense unquestionably is serious and dangerous. Mayhem, particularly when committed with a fire arm, necessarily involves a high risk of harm, and the injury to the victim in this case could not be more extreme. Moreover, the Attorney General emphasizes that defendant committed the offense while angry, and when the victim and his friend had returned to their vehicle and had apologized. Nonetheless, as the jury's verdict reflects, this was not an offense that defendant had calculated. She was provoked, having observed the attack on her father and heard what she understood as a threat by intruding gang members to return. She was handed the gun by her boyfriend only moments before using it to shoot the victim. Defendant undoubtedly over-reacted to the situation, for which she must be punished, but the offense resulted from a moment of impaired judgment in response to the victim's provocation. There was absolutely no planning involved. The jury found defendant not guilty of attempted murder and that she shot the victim in the heat of passion. The court imposed mitigated base terms on all counts. Despite the severity of the victim's injuries, as the Supreme Court recognized in *Lynch,* " 'there are rational gradations of culpability that can be made on the basis of injury to the victim.' " (*In re Lynch, supra*, 8 Cal.3d at p. 426.) Under the circumstances, defendant's culpability is at the bottom end of the spectrum, despite the serious nature of the victim's injuries.

With respect to the nature of the offender, the sentence imposed under the mandatory term for the firearm enhancement is far longer than necessary to effectively punish this particular defendant. " 'Although the determination that a severe punishment is excessive may be grounded in a judgment that it is disproportionate to the crime, the more significant basis is that the punishment serves no penal purpose more effectively

10

than a less severe punishment.'" (*In re Lynch, supra,* 8 Cal.3d at p. 422, quoting *Furman v. Georgia* (1972) 408 U.S. 238, 280.) "This branch of the inquiry therefore focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) Defendant had just turned 19 at the time of the offense. She had no prior criminal record, was living with her family and was employed and helping to support the family. According to the probation report, "the defendant has been a help to her parents, has graduated high school, has no prior criminal history and had been working." Should she be released at any time, the report states, "her goal is to return to college and study cosmetology." According to one of her former teachers she "is a girl with a very high potential in life." According to another, she " 'was a very hard worker, very family oriented and talked about her parents and family a lot.' The defendant never got into any fights or had discipline problems at school." Defendant's good character and general obedience to the law was attested to by numerous reference letters and statements to the court at the sentencing hearing. The record contains no contrary evidence. Defendant's interview with the probation officer was brief "due to the lack of criminal behavior by the defendant." As the jury found in acquitting her of attempted murder, her state of mind when she committed the offense was not pursuit of an illicit objective, but agitation caused by her victim's provocation. Defendant certainly is not the type of "criminal[] misusing guns to terrorize, injure and kill their victims" for whom the mandatory firearm enhancement was intended. (Analysis of Assem. Bill No. 4 (1997-1998 Reg. Sess.) as amended April 28, 1997.)

There are at least two aspects of the sentence itself that are significant in evaluating whether the punishment is cruel or unusual. As was true of the sentence considered in *Dillon,* despite the "broad factual spectrum" of circumstances in which section 12022.53, subdivision (d) may apply, "the Legislature has provided only one punishment scheme" for the use of a firearm causing death or great bodily injury in the commission of any of the offenses specified in the statute. (*People v. Dillon, supra,* 34

11

Cal.3d at p. 477.) And in some of these cases, "this Procrustean penalty may violate the prohibition of the California Constitution against cruel or unusual punishments." (*Ibid.*) As noted above, the crime here was hardly typical of the gun violence to which the enhancement statute was primarily directed. Secondly, there is some merit to defendant's contention that she "has been punished more severely for a lesser-related crime (mayhem) than she could have been punished for the greater crime of attempted voluntary manslaughter." The 25-year-to-life enhancement required by section 12022.53, subdivision (d) does not apply to manslaughter or attempted manslaughter. (§ 12022.53, subd. (a).) The enhancement was imposed only because the prosecution chose to charge defendant not only with attempted murder, leading to her conviction of the lesser offense of attempted manslaughter, but also with mayhem, normally an inevitable consequence of such a shooting. The situation here may be distinguishable from the facts in *People v. Schueren* (1973) 10 Cal.3d 553,[9] on which defendant relies, but it is nonetheless true that involuntary manslaughter is punishable by a sentence of three, six or eleven years (§ 193, subd. (a)), while mayhem is punishable by a sentence of only two, four, or eight years (§ 204), yet the mandatory enhancement applies only to the offense with the lower base term. In that sense, application of the mandatory enhancement to defendant's sentence may fairly be characterized as "unusual" in the constitutional meaning of the term. (*Schueren,* pp. 560-561.)

Moreover, it is also significant that the 27 years to life sentence resulting from the enhancement is longer than the sentence prescribed under California law for first degree

---

[9] In *Schueren,* the Supreme Court held that where a defendant had been convicted of a lesser included offense under the accusatory pleading test for which the statutory punishment was greater than for the offense charged, the constitutional proscription against cruel or unusual punishment prohibited imposition of the longer sentence. Under the circumstances, the court held, a prison term exceeding the sentence for the offense charged was "an 'unusual' punishment." (*People v. Schueren, supra,* 10 Cal.3d at p. 560.) "A statute valid on its face may be unconstitutionally applied [citations] and under the circumstances of this case a prison term exceeding [the shorter term of the offense charged] is an unconstitutional application of the penalty provision of that section." (*Id.* at p. 561.)

murder (§ 190, subd. (a)), rape of a minor (§ 264, subd. (c)), and many other arguably more serious offenses involving intentional acts causing extreme harm. "[I]f among [the criminal penalties prescribed in the jurisdiction] are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect." (*In re Lynch, supra,* 8 Cal.3d at p. 426.)

While comparison of the penalty imposed by California for the use of a gun causing harm to the penalty imposed by other states for like conduct is perhaps of limited significance (see *People v. Martinez, supra,* 76 Cal.App.4th at p. 498), defendant asserts, and the Attorney General does not dispute, that as of July 2016, no other state imposes a similar mandatory enhancement in such a case. At a minimum, "if the challenged penalty is found to exceed the punishments for the offense in a significant number of [other] jurisdictions, the disparity is a further measure of its excessiveness." (*In re Lynch, supra,* 8 Cal.3d at p. 427.)

Detailed comparison of the facts in this case with those in which the courts have rejected claims of cruel and unusual punishment is of limited value. What is significant is that in most of those cases the court considered the defendant to have engaged in reprehensible conduct reflecting a disposition to commit other antisocial acts. For example, in *People v. Em,* the court considered that the "Defendant has proven himself to be completely resistant to the rules and structures of civilized society and the criminal justice system, and to be indifferent to basic social mores. The danger he presents to society is significant. Defendant committed this crime, not because he was in the wrong place at the wrong time, but because he has a complete disregard for the rule of law and lack of respect for human life." (*People v. Em, supra,* 171 Cal.App.4th at p. 976.) In *People v. Gonzales* (2001) 87 Cal.App.4th 1, 16, "defendants were gang members." Although the "youth and incidental criminal history [of one of the defendants were] factors in his favor," the "seriousness of the crime and the circumstances surrounding its commission" indicated that he nonetheless "pose[d] a great danger to society." (*Id.* at p. 17.) In *People v. Martinez, supra,* 76 Cal.App.4th 489, the defendant was convicted of attempted murder. After being asked by the victim to leave his store, the defendant told

13

the victim he was going to return and kill him; he left and obtained a .22-caliber rifle from an acquaintance he told he was going to shoot a person who had disrespected him in front of his girlfriend; he returned to the store, repeating that he was going to kill the victim; after firing one shot that missed the victim, he then shot the victim in the stomach. (*Id.* at p. 492.) The appellate court observed that the "provocation" there "was insignificant in comparison to [defendant's] response, which was vicious and not rash or unsophisticated, and that [the defendant] would have continued shooting if his girlfriend had not been in the way." (*Id.* at p. 496.) Based on the circumstances of the offense and the defendant's lack of remorse, the probation report found the 23-year-old defendant to have " 'a callous disregard for the safety and well-being of others' " whose behavior " 'must be viewed as extremely violent and dangerous . . . . For the safety of the victim and community members, the defendant should be removed from the community for an extended period of time.' " (*Ibid.*) In *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1215, the defendant had "committed an unprovoked murder for the apparent purpose of establishing himself within a street gang, and to establish the gang's strength in the community." The defendant had previously been committed to the California Youth Authority for committing an assault with a deadly weapon, and at the time of the offense in question he was on parole for a previous drive-by shooting. "His recidivism and the violence of his past and current offenses warrant[ed] a lengthy sentence." (*Id.* at p. 1216.)[10] Thus, with respect to the nature of the offender, a principal consideration in evaluating whether a sentence is constitutionally excessive, there is a highly significant difference between the defendant in this case and the defendants in cases in which the 25 year-to-life enhancement has been upheld.

---

[10] *Zepeda* and the other California cases are in accord with decisions of the United States Supreme Court rejecting Eighth Amendment challenges to lengthy sentences applied to recidivist offenders. (E.g., *Ewing v. California* (2003) 538 U.S. 11, 29-30 ["Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record."]; cf. *Lockyer v. Andrade* (2003) 538 U.S. 63 [two consecutive 25 year-to-life sentences imposed under "three strikes" law not an unreasonable application of clearly established federal law].)

We recognize, as we must, that "the Legislature determined in enacting section 12022.53 that the use of firearms in commission of the designated felonies is such a danger that 'substantially longer prison sentences must be imposed . . . in order to protect our citizens and to deter violent crime.' " (*People v. Martinez, supra,* 78 Cal.App.4th at p. 497.) We do not question the validity of the enhancement it prescribes in most situations. Nonetheless, in determining the constitutional permissibility of the sentence in a particular case, "the ultimate test remains whether the punishment prescribed shocks the conscience and offends fundamental notions of human dignity." (*Smith v. Municipal Court* (1978) 78 Cal.App.3d 592, 596.) The sentence here did indeed shock the conscience of most of the jurors who heard all of the evidence,[11] and the probation officer and the trial court also appear to have considered the mandatory 25-year-to-life enhancement most disturbing. Considering the circumstances leading to the commission of this offense and the nature of this particular offender, buttressed by the comparison to other sentences prescribed in California for equally serious offenses and the treatment of gun use in all other American jurisdictions, we are compelled to conclude that this is one of those rare instances in which the prescribed penalty does exceed constitutional limits.

Having determined that defendant's 27-year-to-life sentence constitutes cruel and unusual punishment, we are left with no clear method or standard to determine a permissible sentence under the circumstances. Defendant's crime is a serious offense and

---

[11] A majority of the jurors came forward at sentencing to state they were "stunned to learn of the sentencing guidelines for the enhancements they found true," felt " 'compelled to offer our strong personal views that the mandated jail time for the gun and bodily injury enhancements is just plain wrong for this particular case,' " and that " 'adding a 25-to-life enhancement to the jail time for [the] underlying crimes would not be justice' for the defendant 'and it would not do a thing to help the victim.' " Seven jurors signed a letter to the district attorney stating that they "could not have been more shocked to learn that our verdict ties the judge's hands at sentencing, and that the charges we convicted Ms. Cuiriz of carry a mandatory minimum sentence of 25 years to life. We feel betrayed." Another juror stated he found "the mandatory minimum sentencing associated with those charges in this specific case to be obscene, truly offensive to what I consider to be standards of decency and morality. I feel this way after having heard all of the evidence in the case, after discussing that evidence with the other jurors, and after delivering the guilty verdicts on the various charges."

undoubtedly justifies stern punishment. Simply striking the 25-year enhancement would result in a sentence of only two years, which would not adequately reflect the gravity of defendant's offense or the serious nature of the injury that she inflicted. Given our rejection of the sentence that the trial court imposed under the mayhem count of the information, we believe that activation of the 12-year sentence the trial court imposed but stayed for the commission of attempted voluntary manslaughter will do justice to the public interest in enforcement of the criminal laws while recognizing the defendant's right to avoid excessive punishment. (Cf. *Dillon, supra,* 34 Cal.3d at p. 489 [modifying judgment by reducing degree of the crime to murder in the second degree].) This sentence aggregates the base term for the offense defendant was found to have committed (§§ 193, subd. (a), 664, subd. (a)) and gives appropriate weight to the statutory enhancements for defendant's personal use of a firearm (§ 12022.5, subd. (a)) and having inflicted great bodily injury (§ 12022.7, subd. (b)).[12]

### Disposition

The judgment is modified to vacate the sentence imposed and to vacate the stay with respect to the sentence imposed by the trial court under count one for attempted voluntary manslaughter, imprisonment for a term of 12 years. In all other respects the judgment is affirmed.

---

[12] In view of this disposition it is unnecessary to consider defendant's additional contention that the sentence imposed by the trial court unreasonably penalizes the exercise of the Second Amendment right to bear arms.

_____

Pollak, Acting P.J.

We concur:


_____

Siggins, J.


_____

Jenkins, J.

Trial court:                        Contra Costa County Superior Court

Trial judge:                        Honorable Trevor White

Counsel for plaintiff and respondent:    Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and Arthur P. Beever Deputy Attorney General

Counsel defendant and appellant:    Robert H. Derham and Tiffany J. Gates

A144351